## YELLOW CAB TRANSIT CO. v. JOHNSON et al.

### Civ. No. 1145.

District Court, W. D. Oklahoma.
Dec. 24, 1942.

J. B. Dudley and Duke Duvall, both of Oklahoma City, Okl., for plaintiff.

Mac Q. Williamson, Atty. Gen., for State of Oklahoma, Sam Lattimore, Asst. Atty. Gen., and Lewis R. Morris, Co. Atty., for Oklahoma County, of Oklahoma City, Okl., for defendants.

VAUGHT, District Judge.

In this action the plaintiff seeks injunctive relief against the defendants for interfering with an interstate shipment of freight from East St. Louis, Illinois, to Fort Sill Military Reservation.

The facts disclosed are that the plaintiff is a corporation engaged in the business of transportation of commodities generally by motor vehicle in interstate commerce as a common carrier for hire, operating in

and through and serving the states of Oklahoma, Kansas, Missouri, Illinois, and other states, and points within the geographical limits of said states under and by virtue of authority granted to it by the Interstate Commerce Commission pursuant to the provisions of the Federal Motor Carrier Act of 1935, as amended, being Part II of the Interstate Commerce Act, 49 U.S.C.A. chapter 8, § 301 et seq.

The defendant Walter B. Johnson is the Commissioner of Public Safety of the State of Oklahoma; the defendant T. R. Husted is the Superintendent of the Bureau of Identification and Investigation of the Department of Public Safety of the State of Oklahoma; the defendants B. A. West and Charles Riggs are the deputies of the defendant Husted; the defendant George Goff is the sheriff of Oklahoma County, Oklahoma; and the defendants Mike McGrew and Lewis Kolb are the deputies of the defendant Goff.

The Fort Sill F. A. S. Officers Club is an organization composed of several thousand officers who are stationed and on duty at the United States Fort Sill Military Reservation, and such organization is managed by an Officers Club secretary who is an army officer on active duty. Such club provides, among other things, an officers mess, living quarters for a number of officers, lounges, reading rooms and other recreational facilities, and renders various club services for its membership.

On or about October 24, 1942, there was tendered by M. G. Gintz Company, as consignor, at East St. Louis, Illinois, to plaintiff, and accepted by it in the regular course of its business as a common carrier, a shipment consisting of 225 cases of wines and spiritous liquors, under the standard, uniform, straight bill of lading, and upon which shipment the freight rate provided in said tariffs was prepaid, consigned to the F. A. S. Officers Club Mess at Fort Sill Military Reservation, U. S. A.

The shipment was routed to Fort Sill via Oklahoma City, Oklahoma, and the plaintiff, while transporting the same in one of its trailers, on October 26, 1942, momentarily stopped said trailer at its Oklahoma City terminal and dock to unload therefrom freight other than that destined for the Fort Sill Military Reservation and for points between Oklahoma City and Fort Sill Military Reservation. It was the purpose of the plaintiff, after unloading such freight, to load some 10,000 to 12,000 pounds of freight which it had accumulated at its Oklahoma City terminal for various directions and points, bound for Fort Sill and points intermediate between Oklahoma City and Fort Sill, which freight would have made a truckload of 18,000 to 20,000 pounds; and it was the purpose of the plaintiff to transport and deliver the aforesaid shipment to destination in said reservation in the truck and trailer in which it was transported from point of origin, and without said shipment ever having been removed from said truck and trailer during its entire movement.

On said date of October 26, 1942, shortly after the arrival of the truck and trailer containing the aforesaid shipment at the Oklahoma City terminal of plaintiff, while the same was being loaded with the additional freight above mentioned, while said shipment was still in transit from its origin at East St. Louis, Illinois, to its destination within Fort Sill Military Reservation, and before it had come to rest, the defendants personally, with the exception of George Goff, came upon the premises of the plaintiff at 311 South Western Avenue in Oklahoma City, Oklahoma, and forcibly seized and took possession of said shipment and transported the same away from said premises. The defendants, and each of them, since said seizure, have withheld and are continuing to withhold possession of said shipment from plaintiff, and are interfering with its transportation to the consignee at the point of destination; and said shipment is now in the joint possession and custody of the defendants Walter B. Johnson and George Goff, their deputies, agents, servants and employees.

The Fort Sill Military Reservation site was acquired by the Federal Government from France long before Oklahoma became a state, and is now and has been, since prior to the admission of Oklahoma as a state into the Union, used exclusively for military purposes and for the performance of the functions of the War Department of the Federal Government. The officers mess at Fort Sill was created and is maintained for the care, use and benefit of the officers stationed at Fort Sill, and civilians are not entitled or permitted to use the facilities of such officers mess. A large number of United States army officers live at said Officers Club and it is their only home and place of residence.

Prior to the ordering of the shipment in controversy, several hundred officers, mem-

bers of the Officers Club, gave to the club secretary their respective written orders for varying quantities of liquor, which orders named the brand and quantity desired and were accompanied by check or money to be used in payment of the respective orders. The orders were assembled, tabulated and totaled by the secretary, who, acting for said officers, telephoned the same to the shipper, M. B. Gintz Company, at East St. Louis, Illinois, which accepted the same in said telephone conversation through its general sales manager and pursuant thereto, the shipper made up such orders and delivered them to the plaintiff as a common carrier for hire, for shipment under bill of lading referred to above, and prepaid the freight thereon, which shipment was consigned to the Officers Club in the Fort Sill Military Reservation, and had the shipment arrived, it would have been received at the Officers Club by the secretary of the club for delivery to the aforesaid officers at the club.

The Twenty-First Amendment to the Constitution of the United States provides in part:

"Section 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

"Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

This amendment became effective on December 5, 1933, having been duly ratified by the several states as provided in the Constitution.

On August 27, 1935 Congress enacted a law governing shipments into states having dry laws, 49 Stat. 877, § 202(b), 27 U.S.C.A. § 122, which provides: "The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind, from one State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, into any other State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, or from any foreign country into any State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, which said spirit-uous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory, or District of the United States, or place noncontiguous to but subject to the jurisdiction thereof, is hereby prohibited."

On March 2, 1939 the Legislature of Oklahoma passed an act, S.L.1939, c. 16, 37 Okl.St.Ann. § 41, et seq., the enacting clause of which provides: "An Act creating and providing for a permit system for the importation and transportation of intoxicating liquor, containing more than four per cent of alcohol by volume, into the State of Oklahoma for scientific, sacramental, medicinal, or mechanical purposes; forbidding importation of such liquor without permit; fixing fees; providing penalties; repealing Sections 2597 and 2598, Oklahoma Statutes, 1931; and declaring an emergency."

Section 1, 37 Okl.St.Ann. § 41, of this act provides: "It shall be unlawful for any person, individual or corporate, to import, bring, transport, or cause to be brought or transported into the State of Oklahoma, any intoxicating liquor, as defined by the laws of this State, containing more than four (4%) percent of alcohol by volume, without a permit first secured therefor as hereinafter provided."

The question to be determined is whether or not the Fort Sill Military Reservation, the destination of the shipment of liquor designated in the shipping order attached to the stipulation of the parties, is a point "into the State of Oklahoma" within the decisions of our courts. This raises a number of questions.

First. Was the shipment one in interstate commerce?

In the case of Louisville & Nashville R. Co. v. F. W. Cook Brewing Co., 223 U.S. 70, 32 S.Ct. 189, 56 L.Ed. 355, where it was sought to obtain an injunction against the railroad company from refusing interstate shipments of liquor into what was known to be dry territory in the State of Kentucky, it was held (headnote):

"Beer and other intoxicating liquors are a recognized and legitimate subject of interstate commerce.

"A State cannot forbid a common carrier to transport intoxicating liquors from

a consignor in one State to a consignee in another State.

"Until transportation of intoxicating liquor from one State to another is concluded by delivery to the consignee, the article transported does not become subject to state regulation. * * *

"A state statute regulating shipments of common carriers, although legal as to intrastate shipments, if illegal as to interstate shipments imposes no obligation upon the carrier in regard thereto, nor affords any excuse for refusal to perform its duties as a carrier."

█ Applying this rule, the shipment originating in East St. Louis, Illinois, and destined for Fort Sill Military Reservation, was in interstate commerce and would not become subject to state regulation until delivery at its destination, unless the shipment is in some manner regulated by the Twenty-First Amendment and the laws enacted in support thereof.

Second. Was the Fort Sill Military Reservation a place within the State of Oklahoma over which the State had jurisdiction?

In the case of Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L. Ed. 264, the railroad company sought to recover taxes imposed and paid on its property within the Fort Leavenworth Military Reservation, and the court held:

"When the United States acquire lands within the limits of a State by purchase, with the consent of the Legislature of the State, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings, the Constitution confers upon them exclusive jurisdiction of the tract so acquired; but when they acquire such lands in any other way than by purchase with the consent of the Legislature, their exclusive jurisdiction is confined to the erections, buildings and land used for the public purposes of the Federal Government. * * *

"In the act admitting Kansas as a State, there was no reservation of Federal jurisdiction over the Fort Leavenworth Military Reservation. The State of Kansas subsequently ceded to the United States exclusive jurisdiction over the same, 'saving further to said State the right to tax railroad, bridge, or other corporations, their franchises and property on said reservation.' Held, that the property and franchises of a railroad company within the reservation was liable to pay taxes in the State of Kansas, imposed according to its laws."

Justice Field, in writing the opinion in this case, cited and quoted from the case of Commonwealth v. Clary, 8 Mass. 72, as follows: "The case referred to in which the subject was considered by a learned state court is that of Commonwealth v. Clary, 8 Mass. 72. There the supreme court of Massachusetts held that the courts of the commonwealth could not take cognizance of offenses committed upon lands in the town of Springfield, purchased with the consent of the commonwealth by the United States, for the purpose of erecting arsenals upon them. That was the case of a prosecution against the defendant for selling spirituous liquors on the land without a license, contrary to a statute of the state. But the court held that the law had no operation within the lands mentioned. 'The territory,' it said, 'on which the offense charged is agreed to have been committed, is the territory of the United States, over which the congress have exclusive power of legislation.' It added, that 'the assent of the commonwealth to the purchase of this territory by the United States had this condition annexed to it: that civil and criminal process might be served therein by the officers of the commonwealth. This condition was made with a view to prevent the territory from becoming a sanctuary for debtors and criminals; and from the subsequent assent of the United States to the said condition, evidenced by their making the purchase, it results that the officers of the commonwealth, in executing such process, act under the authority of the United States. No offenses committed within that territory are committed against the laws of this commonwealth, nor can such offenses be punishable by the courts of the Commonwealth unless the congress of the United States should give to the said courts jurisdiction thereof.'"

█ Thus, when the State recognizes the existing Federal jurisdiction or cedes, by legislative act, exclusive jurisdiction to the Federal Government over such lands, except such as it specifically reserves to itself, such act of cession establishes and limits that jurisdiction. Such was the holding in Standard Oil Company of California v. People of State of California, 291

U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775, where the State of California undertook to lay and collect an excise tax upon every distributor for each gallon of motor vehicle fuel "sold and delivered by him in this state." St.Cal.1923, p. 571, as amended.

The Standard Oil Company of California, a Delaware corporation, sold and delivered to the Post Exchange, within the Presidio of San Francisco, 420 gallons of gasoline. It carried this to the Exchange's place of business in barrels or tanks by trucks. Both sale and delivery were within the area long held and occupied by the United States for Military purposes. Upon appeal to the Supreme Court of the United States, from a decision in favor of the state, the case was reversed, the court holding as follows: "A State is without power to levy a license tax in respect of the selling and delivery of goods on a military reservation included within the exterior limits of the State but over which the full legislative authority has been ceded to the United States by an Act of the State Legislature."

The court, after quoting the language used by the act of cession of jurisdiction by the state legislature, which act of cession is very similar to the act of the State of Oklahoma ceding jurisdiction over the Fort Sill Military Reservation, used the following language:

"Appellant challenges the validity of the taxing act as construed by the Supreme Court. The argument is that since the state granted to the United States exclusive legislative jurisdiction over the Presidio, she is now without power to impose taxes in respect of sales and deliveries made therein. This claim, we think, is well founded; and the judgment below must be reversed.

"In three recent cases—Arlington Hotel Co. v. Fant, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447, United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761, and Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091—we have pointed out the consequences of cession by a state to the United States of jurisdiction over lands held by the latter for military purposes. Considering these opinions, it seems plain that by the act of 1897 California surrendered every possible claim of right to exercise legislative authority within the Presidio—put that area beyond the field of operation of her laws."

The question has been raised over the manner in which the Fort Sill Military Reservation was acquired by the United States. It has been stipulated that the territory comprising it was acquired by the United States. It has been stipulated that the territory comprising it was acquired from France long before there was a Territory or State of Oklahoma. The Act of Congress of May 2, 1890, 26 Stat. at Large 81, known as the Organic Act, designated the boundaries of the Territory of Oklahoma. The lands comprising the original Fort Sill Military Reservation are not embraced within those boundaries.

The Act of Congress of March 3, 1901, 31 Stat. 1093, provided for the opening for settlement of the Kiowa-Comanche Country including the territory around the Fort Sill Military Reservation. The Fort Sill and El Reno Military Reservations were not opened for settlement under that act, but were referred to in locating the land offices in that enactment, as follows: "Sec. 3. The President is hereby authorized to establish two additional United States land districts and land offices in the Territory of Oklahoma, * * * one of the land offices shall be located at El Reno, in the county of Canadian; and the other shall be located at the county seat nearest Fort Sill. * * *"

It will be observed that one of the land offices was to be established at El Reno, which was an established town within the Territory of Oklahoma, and the other to be in a county seat town "nearest Fort Sill."

The Act of Congress of June 16, 1906, 34 Stat. 267, known as the Enabling Act, which provided for the creation of the State of Oklahoma, provided or designated no different boundaries, but began as follows: "Be it enacted * * * That the inhabitants of all that part of the area of the United States now constituting the Territory of Oklahoma and the Indian Territory, as at present described, may adopt a constitution and become the State of Oklahoma, * * *."

In the Constitution of the State of Oklahoma, adopted in convention June 16, 1907, ratified by the people September 17, 1907, and approved by Presidential Proclamation November 16, 1907, in Section 3, Article I, we find the following language: "The people inhabiting the State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, * * *."

It is therefore apparent that the original Fort Sill Military Reservation was never a part of, or under the jurisdiction of, the Territory or State of Oklahoma, except as such jurisdiction has been specifically ceded to the State by Congress.

In view of this situation, it is both interesting and enlightening to view some of the decisions of the Oklahoma Supreme Court in its interpretation of the law governing the situation, as litigation involving the question arose from time to time. It is quite clear that it very definitely has determined its attitude toward it and has never intimated that the Fort Sill Military Reservation was a part of the State of Oklahoma although being situated within its boundaries.

In the case of Utley et al. v. State Industrial Commission et al., 176 Okl. 255, 55 P.2d 762, Utley was given an award by the Industrial Commission for injuries received during his employment at the Fort Sill Military Reservation. The employer and insurance carrier instituted an action to review the award, contending that the Workmen's Compensation Act of Oklahoma, 85 O.S.1941, § 1 et seq., was not applicable and that the Industrial Commission was without jurisdiction over the injuries received by Utley in the course of his labor performed on the United States Military Reservation at Fort Sill. The court held: "The Oklahoma Workmen's Compensation Act does not apply to injuries occurring within the Fort Sill Military Reservation, although such place is within the exterior boundaries of the state, since exclusive jurisdiction of such place was ceded to the United States."

In the body of the opinion the court said:

"The Fort Sill Military Reservation was set aside and designated as such before the state of Oklahoma was created, and the land constituting that reservation was not purchased by the federal government from the state of Oklahoma within the meaning and for the purposes included within article 1, § 8, cl. 17, of the Constitution of the United States, but was owned by the United States by cession from France many years before Oklahoma became a state.

"In 1913 our state Legislature by enactment (Laws 1913, c. 52 [80 O.S.1941 § 4]) ceded exclusive jurisdiction to the United States of all territory 'now owned by the United States and comprised within the limits of the Military Reservations of Fort Sill,' reserving the right, however, to serve civil or criminal process within the reservation in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed outside of the reservation."

And again in the case of In re Annexation of Reno Quartermaster Depot, etc., 180 Okl. 274, 69 P.2d 659, it was held: "Article 1, section 8, U. S. Constitution confers exclusive jurisdiction upon Congress to legislate in respect to military reservations and similar instrumentalities of the federal government, and the general school laws of this state can have no application to the military reservations located within the state."

In the body of the opinion, the court commented upon and set out in detail the Cession Act of 1913 of the State of Oklahoma as follows: "The lands comprising the Fort Reno Military Reservation belonged to the United States and were used as a military reservation long before the territory or the state of Oklahoma came into existence, and when the state was organized, these lands were reserved by the federal government, and Congress has passed no act specifically yielding jurisdiction over the Reservation to the state. Nevertheless, the Fourth Legislature of the state of Oklahoma, *assuming that statehood conferred upon the state the right of sovereignty over all the territory within its boundaries, and desiring to take cognizance of the jurisdiction essentially belonging to the federal government over the Reservation, and reserving to the state only such jurisdiction and powers generally recognized by the federal government in such cases as not inconsistent with* the free and effective use of the lands for the purposes intended, passed the Act of March 17, 1913, ceding to the federal government exclusive jurisdiction, with certain reservations, said act being chapter 52, section 1, Sess.Laws 1913, and brought forward as section 12253, O.S.1931 (80 Okl.St.Ann. § 4), being as follows: 'That exclusive jurisdiction be, and the same is hereby ceded to the United States over all the territory now owned by the United States and comprised within the limits of the Military Reservations of Fort Sill, in Comanche County, and Fort Reno, in Canadian County, as declared from time to time by the President of the United States, and over such lands as may hereafter be acquired for the enlargement of said reservations; provided, however, that the State of Oklahoma reserves the right

to serve civil or criminal process within said reservations in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said state but outside of such cessions and reservations; provided, further, that the State of Oklahoma reserves the right to tax railroad companies and other corporations and their franchises and property on said reservations; and provided, further, that the jurisdiction herein ceded shall continue no longer than the United States shall own and hold said reservations for military purposes.'" (Emphasis supplied.)

In the reply brief, counsel for defendants cite the most recent expression of the Supreme Court of Oklahoma in the case of Ottinger Brothers et al. v. Clark et al., 131 P.2d 94, decided November 17, 1942. In this case the Oklahoma Workmen's Compensation Law again was before the court with reference to injuries received at the Fort Sill Military Reservation and the court held:

"Where an express cession of jurisdiction, with reservations, is made by the State Legislature in favor of the United States, Congress has power to relinquish or recede to the State the jurisdiction thus acquired, without abandoning the property or its legitimate use.

"Jurisdiction, with reservations, acquired from a state, although exclusive while it subsists, is to be regarded as a mere suspension of the State Jurisdiction and, therefore, an Act of Congress relinquishing such jurisdiction, or any part thereof, and receding it to the State, is effective for that purpose, without any acceptance or assent by the State."

In the body of the opinion the court said:

"In 1936 Congress conferred upon or receded to the state the jurisdiction to extend the compensation law to the reservation. See Act of June 25, 1936, 49 Stat. at L. 1938, 40 U.S.C.A. § 290.

\* \* \* \* \* \*

"In the present case the state had full political jurisdiction over the military reservation until the statute of cession was enacted in 1913. The effect of that statute was to place in abeyance the powers of the legislature to extend the laws of the state to the reservation. When the Workmen's Compensation Law was enacted in 1915, it did not extend to the reservation by reason of the prior cession of jurisdiction. Utley v. State Industrial Commission, supra. But that law was merely in suspension or abey-

ance so far as the reservation was concerned. As long as the United States retained the exclusive right to legislate concerning that area as ceded by the state, the state could not apply the statute. However, when Congress receded the jurisdiction to the state by the 1936 Act, supra, the law was no longer in abeyance and applied, ipso facto, to the reservation. We have no fault to find with the opinion in the Utley case, supra, and the opinion under the then existing law was undoubtedly correct. The Utley case is readily distinguishable from the case at bar. From statehood until the Act of 1913, supra, was enacted the state, not the United States, had political control of the reservation. The United States then, after 1913, had jurisdiction over the reservation until the Act of Congress of 1936, supra. The Utley case was decided before the enactment of the last above mentioned Act.

"* * * The question herein is not one of the adoption of state laws, nor an attempted delegation of jurisdiction by Congress, but a question of relinquishing and revesting in the state a portion of the jurisdiction that the state had temporarily suspended in itself and vested in the Federal Government by its act of cession of 1913.

\* \* \* \* \* \*

"Petitioners also contend that the Act of Congress of 1936, supra, was not accepted by the state legislature until June, 1941, which acceptance was not in effect at the time the accident herein occurred and for that further reason the Industrial Commission was without jurisdiction to make the award. We think this contention is without merit. The case of Renner v. Bennett [21 Ohio St. 431], supra, is authority for the rule that acceptance of the act of recession is unnecessary. If an acceptance was necessary, then it would have been equally necessary that the Congress of the United States accept the act of the Legislature of 1913 ceding jurisdiction to the United States. That was never done. But as shown in Fort Leavenworth Railroad Co. v. Lowe, supra, and St. Louis-San Francisco R. C. v. Satterfield [8 Cir., 27 F.2d 586], supra, said act was effective without any acceptance by Congress. The Act of Congress of 1936, supra, therefore became effective immediately after its final passage."

This court cannot agree to the above conclusion, "from statehood until the Act of 1913, supra, was enacted the state, not

the United States, had political control of the reservation." The state never has had, does not now have, and cannot have, jurisdiction over the reservation except as it has been, or might be, ceded by the United States from time to time. This it seems was in the mind of the writer of the opinion in the case of In re Annexation of Reno Quartermaster Depot, supra, wherein the following language was used: "Nevertheless, the Fourth Legislature of the State of Oklahoma, assuming that statehood conferred upon the state the right of sovereignty over all the territory within its boundaries * * * passed the Act of March 17, 1913 * * *."

But regardless of how the question may be viewed by that court, the determination of the extent of the jurisdiction of the United States over the Fort Sill Military Reservation is a question for adjudication by the federal courts since it is construing a cession made by Congress and not a cession from the State of Oklahoma, except as it may apply to such additions as have been made to the original Fort Sill Military Reservation from lands over which the State of Oklahoma at one time had exclusive jurisdiction. And the decisions all seem to be in harmony with the view that when the Act of March 17, 1913 was enacted the United States had exclusive jurisdiction over the reservation except for the purposes reserved to the state by Congress.

From these decisions and the language used therein, and the interpretation given by the Supreme Court of the United States of such enactments, it is plain that exclusive jurisdiction over the Fort Sill Military Reservation is in the United States, except for purposes specifically reserved by the State of Oklahoma in its legislative enactment of March 17, 1913. Those reservations were to serve civil and criminal process, to tax railroad companies and other corporations and their franchises and property on said reservations, and as was stated in Standard Oil Co. v. People of State of California, supra, by that act it "put that area beyond the field of operation of [its] laws," unless the jurisdiction was widened or extended over the reservation by the Twenty-First Amendment to the Constitution of the United States and the laws enacted by virtue thereof.

That brings us to the third and main question involved in the light of the decisions. Was the destination of the shipment "into the State of Oklahoma?"

In the case of Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502, many of the points involved in the case at bar were discussed, and the decisions of the courts relating thereto applied. This case appears to be the latest expression of the Supreme Court of the United States on the subject and is binding upon this court. The Yosemite Park & Curry Company brought suit seeking to enjoin the State Board of Equalization and the Attorney General from enforcing the "Alcoholic Beverage Control Act" of the State of California within the limits of Yosemite National Park. Among other allegations of the complaint one was made that the appellants threatened to seize beverages on, or being transported to, appellee's premises, demand rendition of reports and keeping of accounts, and threatened to institute civil and criminal proceedings against appellee for violation of the act. A permanent injunction was granted on several grounds. The Supreme Court on appeal reversed the lower court with instructions as to certain phases of the case. In the opinion, however, it declared the law very clearly on other phases of the case as it pertains to the case at bar, the court holding as follows:

"The United States, owning land set aside as a national park within the boundaries of a State, may constitutionally accept from the State a cession of jurisdiction over it. The jurisdiction ceded need not be exclusive but may be limited by reservations of powers in the State, such as the power to tax persons and their property on the land included.

"It is not essential to valid acquisition of jurisdiction by cession from a State that the land involved shall be acquired by the United States for one of the purposes specified in Clause 17, § 8, Art. I, of the Constitution.

&ast; &ast; &ast; &ast; &ast; &ast;

"The other lands composing the Park have remained in the proprietorship of the United States since the time of the Treaty. By Act of April 15, 1919, California granted exclusive jurisdiction over the Park as a whole, saving certain rights, including the right 'to tax persons and corporations, their franchises and property' on the lands included; and this was accepted by the Act of Congress of June 2, 1920 [16 U.S.C.A. § 57 et seq.]."

This is substantially what occurred in the case at bar, by the Act of the Oklahoma Legislature on March 17, 1913. Continuing from the Collins case, supra, the court further held:

"2. (1) That whatever the status of jurisdiction existing at the time of their enactment, these Acts of cession and acceptance, of 1919 and 1920, are to be taken as declarations of the agreements, reached by the respective sovereignties, State and Nation, as to the future jurisdiction and rights of each in the entire area of Yosemite National Park.

"(2) Distinguished from the right to tax, the power to regulate the sale and use of alcoholic beverages was not reserved by the State, and such regulations are not enforceable in the Park.

\* \* \* \* \* \*

"(4) This reservation does not authorize the State to exact, for the sale or importation of alcoholic beverages in the Park, the fees for licenses which are provided by § 5 of the California Alcoholic Beverage Control Act, those provisions being regulatory in character.

\* \* \* \* \* \*

"4. The Twenty-First Amendment did not confer upon a State the power to regulate the importation of intoxicating liquors into territory over which it has ceded to the United States exclusive jurisdiction."

In the body of the opinion, the court used this language: "The State makes the point that section 2 of the XXI Amendment gives it the right to regulate the importation of intoxicating liquors. Reliance for enforcement is placed upon sections 49 and 49.2 of the Alcoholic Beverage Control Act. The argument for this claim is bottomed upon our decision in State Board of Equalization v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38, where we held that a statute imposing a $500 license fee for importing and a $750 license fee for brewing beer did not violate the commerce clause or the equal protection clause, because the words of the XXI Amendment 'are apt to confer upon the state the power to forbid all importations' and 'the State may adopt a lesser degree of regulation than total prohibition.' \* \* \* The lower court was of the opinion that though the Amendment may have increased 'the state's power to deal with the problem \* \* \*, it did not increase its jurisdiction.' \* \* \* With this conclusion, we agree. As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment. *There was no transportation into California 'for delivery or use therein.'* The delivery and use is in the Park, and under a distinct sovereignty. Where exclusive jurisdiction is in the United States, without power in the State to regulate alcoholic beverages, the XXI Amendment is not applicable." (Emphasis supplied.)

The writer of this opinion may have his personal views with reference to the general policy of permitting the use of intoxicants within military reservations within so-called "dry states", however, in this case the facts are stipulated by the parties and the law has been declared by the Supreme Court of the United States, and, therefore, no alternative is left this court but to apply the declared law to the admitted facts.

The issues must be determined in favor of the plaintiff. A mandatory injunction will issue directing the defendants to return the shipment in question to the plaintiff for delivery to its original destination. An exception is allowed defendants.

A form of judgment consistent with this opinion may be submitted within ten days from this date.