## JOHNSON ET AL. v. YELLOW CAB TRANSIT CO.

No. 447. Argued January 6, 7, 1944.—Decided March 13, 1944.

---

*Mr. Sam H. Lattimore,* Assistant Attorney General of Oklahoma, with whom *Mr. Randell S. Cobb,* Attorney General, was on the brief, for petitioners.

*Messrs. John B. Dudley* and *Duke Duvall* for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioners are officials of Oklahoma State and Oklahoma County concerned with enforcement of Oklahoma's liquor laws. Respondent is a common carrier by motor vehicle authorized by the Interstate Commerce Commission to transport in interstate commerce various commodities, including wines and liquors. See U. S. C. Title 49, c. 8. In regular course of business the respondent-carrier undertook to transport 225 cases of wines and liquors from East St. Louis, Illinois, through Missouri, into Oklahoma and thence to a consignee at Fort Sill, a military reservation within the boundaries of Oklahoma. While the vehicle carrying the liquors was momentarily stopped at Oklahoma City for the purpose of loading and unloading other freight, the petitioner-officials forcibly seized and took away the liquors.

The carrier filed a complaint in the federal District Court alleging that the seizure constituted an unlawful interference with its authorized interstate transportation, and praying that the Court order the officials to return the liquors so that it might deliver them to the consignee at Fort Sill. The answer to the complaint, in substance, admitted the material facts relative to the shipment and seizure of the liquors but denied the allegation of the complaint that the seizure was unlawful. The answer did not allege that judicial proceedings concerning the seized liquor were pending, or were to be commenced, in an

Oklahoma state court. After a trial on stipulated facts, the District Court ordered the liquors returned to the carrier and forbade the officials to interfere with completion of the shipment. 48 F. Supp. 594. The Circuit Court of Appeals, one Judge dissenting, affirmed. 137 F. 2d 274.

Questions presented in the petition for review concerning important state and federal relationships with regard to federal enclaves prompted us to grant certiorari. 320 U. S. 731. Argument has revealed, however, that the determinative issues are more narrow: (1) Did transportation of the liquors through Oklahoma violate that State's law so as to justify their seizure? (2) Should the District Court have denied the carrier equitable relief because of the "unclean hands" doctrine, even though seizure of the liquors by the officials was illegal? This second question rests on the disputed premise that introduction of the liquors into Fort Sill would have violated the laws of the United States.

Petitioners do not claim, nor could they claim, that either of these two separate questions should be decided in their favor on the ground that Oklahoma has power to control liquor transactions on the Fort Sill Reservation. With certain minor exceptions not here material, Oklahoma ceded to the United States in 1913 whatever authority it ever could have exercised in the Reservation.[1] The Oklahoma Supreme Court has recognized that the general power to govern the Fort Sill area is vested in the United States, not in Oklahoma,[2] and our decisions lead to the same conclusion.[3]

---

[1] Oklahoma Laws, 1913, c. 52, p. 90.

[2] See *Utley* v. *State Industrial Commission*, 176 Okla. 255, 55 P. 2d 762; *In re Annexation of Reno Quartermaster Depot Military Reservation*, 180 Okla. 274, 69 P. 2d 659.

[3] See *Collins* v. *Yosemite Park Co.*, 304 U. S. 518, 533; *Pacific Coast Dairy* v. *Department of Agriculture*, 318 U. S. 285, 294.

*First.* .Since power to govern Fort Sill is in the United States, and since the seized liquors were not to be sold, delivered or otherwise disposed of in Oklahoma proper, as distinguished from Fort Sill, the only Oklahoma laws called to our attention which could have justified the seizure are those which apply to liquor transportation. No Oklahoma law purports on its face to prohibit or regulate interstate shipments of liquor into and through the state to another state, or to an area subject to the exclusive jurisdiction of the United States. And we were informed at the bar by Oklahoma's legal representative that no state statute had been construed by any state court as applying to such through shipments. Oklahoma law does make it unlawful "to import, bring, transport, or cause to be brought or transported *into the State* . . . intoxicating liquor . . . without a permit . . . as hereinafter provided." Okla. Stat. (1941) Title 37, § 41. The argument is that the Oklahoma legislature intended this statute to apply to liquor imported into the Fort Sill Reservation because the latter is located within the exterior boundaries of Oklahoma. Were this statute intended to do no more than provide a means whereby the state could protect itself from illegal liquor diversions within the area which Oklahoma has power to govern, the interpretation asked might well be an acceptable one. *Duckworth* v. *Arkansas*, 314 U. S. 390; *Carter* v. *Virginia*, 321 U. S. 131. But the statute has no such limited purpose. No permit to transport liquor into Oklahoma can be obtained at all except for scientific, mechanical, medicinal, industrial, or sacramental purposes. Okla. Stat. (1941) Title 37, § 42. To construe the state statute in the manner urged would be to say that, although Oklahoma admittedly has no power directly to regulate the liquor traffic on the Reservation, the Oklahoma legislature intended practically to exclude from the Reservation liquor which might be put to legal uses under controlling United States laws. Neither the words nor

the scheme of the statute in question, nor any other relevant material pointed out to us, indicate that the Oklahoma legislature had such a purpose. Had the legislature expressed such a purpose, questions would be raised which we need not here consider. See *Collins* v. *Yosemite Park & Curry Co.*, 304 U. S. 518, 533; *Pacific Coast Dairy* v. *Department of Agriculture*, 318 U. S. 285, 295. Consequently, we find no justification for the seizure in Oklahoma law.

*Second.* But it is said that despite the fact the seizure was illegal and wholly without justification, the consignee could not have received the liquors without violating the laws of the United States and for that reason the District Court should have denied the carrier any relief under the "clean hands" doctrine.

We may assume that because of the clean hands doctrine a federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law.[4] But this does not mean that courts must always permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law in the transactions involved.[5] The maxim that he who comes into equity must come with clean hands is not applied by way of punishment for an unclean litigant but "upon considerations that make for the advancement of right and justice." *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245. It is not a rigid formula which "trammels the free and just exercise of discretion." *Ibid.*, 245, 246.

---

[4] See generally 2 Pomeroy's Equity Jurisprudence (5th Ed.) §§ 402, 403. Cf. *Bentley* v. *Tibbals*, 223 F. 247, 252; *Bonnie & Co.* v. *Bonnie Bros.*, 160 Ky. 487, 495, 169 S. W. 871.

[5] See, e. g., *Catts* v. *Phalen*, 2 How. 376; *Kinsman* v. *Parkhurst*, 18 How. 289, 293; *Stark* v. *Grant*, 16 N. Y. S. 526; *Martin* v. *Hodge*, 47 Ark. 378, 1 S. W. 694.

Therefore, before deciding the applicability of the maxim to the case at hand, we must examine the particular transactions and circumstances involved together with the federal laws which are alleged to taint these transactions with illegality.

As shown by the stipulated facts in this record, the circumstances of the liquor shipment were as follows: Fort Sill had an Officers' Club, which provided among other things an officers' mess, living quarters for some Officers, and other customary club facilities. Several hundred Officer-members gave to the Club Secretary, himself an Officer, separate written orders for liquor together with money or checks in payment for the respective orders. Acting for the Officer-members, the Secretary telephoned from Fort Sill to a dealer at East St. Louis, Illinois, and ordered the liquors shipped to the Club. The dealer delivered the liquors to the respondent-carrier under a uniform through bill of lading. It was this shipment which the state officials seized. Had the shipment not been seized it would have arrived at the Club for delivery to the several Officers who had paid for it.

It is first contended that purchase and delivery of the liquors were in violation of U. S. C. Title 10, § 1350, set out in the margin.[6] The agreed facts, summarized above, sufficiently show that the transactions were not in violation of this statute.

Petitioners next argue that the liquor transactions here involved were in violation of the assimilative crimes statute.[7] This statute, it is said, adopts all of the various

---

[6] "The sale of or dealing in, beer, wine or any intoxicating liquors by any person in any post exchange or canteen or army transport or upon any premises used for military purposes by the United States, is hereby prohibited. The Secretary of War is hereby directed to carry the provisions of this section into full force and effect." 31 Stat. 758; U. S. C. Title 10, § 1350. See Note 9, *infra*.

[7] "Whoever, within the territorial limits of any State, . . . but within or upon any of the places now existing or hereafter reserved

penal statutes of Oklahoma relating to liquor and makes them the federal law applicable to the Fort Sill Reservation. Cf. *United States* v. *Press Publishing Co.*, 219 U. S. 1; *Franklin* v. *United States*, 216 U. S. 559. Petitioners' argument as to the applicability of the assimilative crimes statute raises at least three distinct questions, no one of which is easily resolved: (1) Which, if any, of the Oklahoma penal statutes are so designed that they could be adopted by the assimilative crimes statute and applied to Fort Sill?[8] See opinions of Circuit Court of Appeals, *supra;* cf. *Murray* v. *Gerrick & Co.*, 291 U. S. 315. (2) If there are Oklahoma statutes which could be so adopted, are

or acquired, described in section 272 of the Criminal Code . . ., shall do or omit the doing of any act or thing which is not made penal by any laws of Congress, but which if committed or omitted within the jurisdiction of the State, Territory, or district in which such place is situated, by the laws thereof in force on February 1, 1940, and remaining in force at the time of the doing or omitting the doing of such act or thing, would be penal, shall be deemed guilty of a like offense and be subject to a like punishment." 54 Stat. 234, U. S. C. Title 18, § 468. Section 272 of the Criminal Code, referred to in this Act, is broad enough to include the Fort Sill Reservation. 35 Stat. 1143.

[8] The Oklahoma liquor statutes pertaining to liquor imports provide one illustration of the difficulties inherent in this question. These penal statutes are designed to enforce a system of licensing such imports by special permits issued by a state agency. Okla. Stat. (1941) Title 37, §§ 41–48. Importation of liquors without a special permit is made penal. *Ibid.*, §§ 41, 46. To hold, therefore, that the assimilative crimes statute adopts Oklahoma's penal liquor laws the Court might further have to hold that that statute compels federal officials on the Fort Sill Reservation to apply for and obtain state permits before they can lawfully import any liquors for any purpose. And a strong argument might be made that had Congress intended such a drastic result, it would have considered the problem and used more express language. See Note 7, *supra;* Senate Report No. 1699, Senate Judiciary Committee, 76th Cong., 3d Sess.; House Report No. 1584, House Judiciary Committee, 76th Cong., 3d Sess. Cf. *Collins* v. *Yosemite Park Co.*, 304 U. S. 518, 533.

all or any of them in conflict with federal policies as expressed by Acts of Congress other than the assimilative crimes statute or by valid Army Regulations [9] which have the force of law? [10]  Cf. *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94, 99–104.  (3) Assuming that certain Oklahoma statutes are adaptable, and are not inconsistent with federal policies, would such statutes make penal the liquor transactions here stipulated to have taken place?  Inextricably involved in each of the three questions is the further problem of whether certain of the Oklahoma liquor statutes may be inconsistent with Oklahoma's constitution as interpreted by the Oklahoma Supreme Court.  See opinions of the Circuit Court of Appeals, *supra; Ex parte Wilson,* 6 Okla. Cr. 451, 119 P. 596; *Morse* v. *State,* 63 Okla. Cr. 445, 77 P. 2d 757.

Considering the difficulty and importance of a correct decision of the novel issues which an attempt to construe this federal criminal statute would present, together with the other circumstances of the present case, we are convinced that in the interest of sound administration of justice we should refrain from a complete exploration of these issues in this proceeding, especially since these is-

---

[9] Army regulations have declared certain liquor policies for Army reservations generally.  See, e. g., A. G. 250.1 (1–20–43), concerning the sale of liquor upon premises used for military purposes by the United States, published by the War Department on January 25, 1943, in Circular No. 29; and A. R. 210–65, concerning Army Exchanges, published by the War Department on March 19, 1943.  Petitioners have not contended that the liquor transactions here were contrary to any Army Regulations, and no Regulations have come to our attention which would indicate that there is a basis for such a contention.  Whether the declaration of policies contained in these various regulations indicates an intention of the War Department to permit all liquor transactions not expressly prohibited, and whether, if it does, the War Department has the power under Acts of Congress to permit such transactions, seem open questions.

[10] *Standard Oil Co.* v. *Johnson,* 316 U. S. 481, 484.

sues are only collateral to the principal issue of the legality of the seizure of the liquor. Were we to decide that the assimilative crimes statute is not applicable to this shipment of liquors, we would, in effect, be construing a federal criminal statute against the United States in a proceeding in which the United States has never been represented. And, on the other hand, should we decide the statute outlaws the shipment, such a decision would be equivalent to a holding that more than 200 Army Officers, sworn to support the Constitution, had participated in a conspiracy to violate federal law. Not only that, it would for practical purposes be accepted as an authoritative determination that all army reservations in the State of Oklahoma must conduct their activities in accordance with numerous Oklahoma liquor regulations, some of which, at least, are of doubtful adaptability. And all of this would be decided in a case wherein neither the Army Officers nor the War Department nor the Attorney General of the United States have been represented, and upon a record consisting of stipulations between a private carrier and the legal representatives of Oklahoma.

Nor is it any answer to say that the carrier should be compelled to sue in the Oklahoma state courts to reclaim the liquors in order to give the Oklahoma courts the opportunity collaterally to pass upon the question of whether these liquor transactions violate the federal assimilative crimes statute. That broad question, though some parts of it involve a consideration of the proper scope of the state law adopted by the federal government, is in the final analysis a question of the correct interpretation of a federal criminal statute, and therefore an issue upon which federal courts are not bound by the rulings of state courts. *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, 266. Indeed Congress has vested in the federal courts exclusive jurisdiction over the trial of all federal crimes. Judicial Code § 256 as amended, 28 U. S. C. § 371. And so, even if the carrier

could bring suit in an Oklahoma state court to reclaim the liquor, a point which is itself subject to some doubt,[11] the federal District Court should not for that reason refuse relief in the present suit.

The ultimate question in this part of the case is whether the carrier, whose complete good faith is in no way questioned, should have the court's doors shut to it. So to hold would be to say that the state officials, who so far as this record shows, had no search warrant or judicial process of any kind,[12] could retain liquors which they seized without authority of law. We do not find here any "unconscientious or inequitable attitude" on the part of the carrier. *International News Service* v. *Associated Press*, 248 U. S. 215, 245. And so far as this record shows, the carrier, in seeking relief in the courts against the unlawful seizure, has proceeded in the only "practicable and adequate way"[13] available.

If the carrier's delivery of these liquors on the Fort Sill Reservation would violate any federal law, federal agen-

---

[11] Nothing in the record or briefs justifies the conclusion that the carrier could bring such a proceeding in the state courts. And see Okla. Stat. (1941) Title 37, §§ 72, 86, and 89; *Blunk* v. *Waugh*, 32 Okla. 616, 122 P. 717; *Lee* v. *State*, 180 Okla. 643, 71 P. 2d 1090; cf. *1942 Chevrolet Automobile Motor No. BA–193397* v. *State*, 191 Okla. 26, 27, 128 P. 2d 448. Nor has there been any attempt to show that, if the carrier could bring such a proceeding, the Army Officers, the War Department, and the Attorney General of the United States could intervene on the collateral issue of "clean hands."

[12] Under Oklahoma law there are no "property rights" in liquor. Okla. Stat. (1941) Title 37, § 72. Officers with power to execute criminal process may arrest without a warrant one who violates the state liquor laws, and seize the property used in the violation, and it is their duty to take the property before a Court which may order it forfeited and destroyed. *Ibid.*, §§ 89, 90. As stated in the body of the opinion, the record does not show that proceedings of any kind were ever instituted, or sought to be instituted, in the state courts.

[13] *McFarland* v. *American Sugar Refining Co.*, 241 U. S. 79, 84–85; see also *Bowman* v. *Chicago & Northwestern Ry. Co.*, 125 U. S. 465.

cies exist which are charged with responsibilities to institute appropriate proceedings against the carrier in federal tribunals. In such proceedings the parties would be the United States and the carrier, and the issue of violation of federal laws would be directly, and not collaterally, presented. The complicated federal questions involved, concerning various federal statutes as well as Army rules and regulations, could be answered upon an adequate presentation of all factors essential to a right and just determination.

And, similarly, if the several hundred Army Officers who ordered and paid for these liquors have acted contrary to United States Statutes, Army Regulations, or Orders of the Post Commandant, it is not to be doubted that the Army or some other United States agency is capable of determining what course shall be pursued. Should the United States determine to proceed in the matter it could do so at such time and place as least would hamper essential military training, and the Army Officers would be heard before they would be stigmatized as law breakers and subjected as such to Army discipline. We will not, at this time, and upon this inadequate record, resolve all doubts against the lawfulness of their conduct in order to deny relief against a plainly unlawful seizure of their property from an interstate carrier whose good faith has not been questioned.

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting:

MR. JUSTICE ROBERTS and I are unable to agree with the Court's decision.

The ultimate issue in this case is whether a federal court should, by issuing an injunction, aid in the consummation of what appears to be a violation of the Criminal Code of the United States. For it must not be forgotten that a mandatory injunction, the relief sought in this suit, "is

an extraordinary remedial process which is granted, not as a matter of right but in the exercise of a sound judicial discretion." *Morrison* v. *Work,* 266 U. S. 481, 490.

A large shipment of wine and spirituous liquors was seized by law-enforcement officers of the State of Oklahoma while the liquor had temporarily come to rest at the terminal of the Transit Company. The liquor, in course of transit from East St. Louis, Illinois, to the Fort Sill, Military Reservation, was destined for the Officers Club at the Reservation for delivery to several hundred members of the Club on whose behalf its secretary was managing the importation of the liquor. Upon seizure the liquor was deposited in the County Court House of Oklahoma County, where it is held as an illegal shipment of intoxicating liquor subject to forfeiture and destruction. Thereupon the Transit Company brought this suit for a mandatory injunction against the state officers, requiring them to return the shipment and to refrain from interfering with its delivery by the Transit Company at the Reservation. The injunction issued and the Circuit Court of Appeals, in two separate opinions, approved, with one judge dissenting. 48 F. Supp. 594; 137 F. 2d 274.

The facts establish that that which was done, if it had been done in Oklahoma proper, would under its laws have constituted a misdemeanor. Delivery of the liquor on the Reservation would therefore be an offense under the federal criminal law by virtue of the Act of June 6th, 1940, 54 Stat. 234, whereby Congress made applicable to the Reservation the penal laws of Oklahoma in existence on February 1, 1940, 18 U. S. C. § 468. But even if there were doubt that the importation of the liquor into the Reservation under the circumstances of this record would offend the Criminal Code of the United States, on the ground that the act if committed within the jurisdiction of Oklahoma "by the laws thereof in force on February 1, 1940 . . . would be penal," equity should resolve the

doubt in favor of law by denying the extraordinary remedy of injunction instead of resolving it against law by granting the injunction.

Oklahoma is, colloquially speaking, a dry State. Only for strictly defined purposes may liquor from without the State be lawfully brought into it for consumption. Prohibited importations are penalized. If a transaction like the one before us related wholly to Oklahoma soil it would—there can hardly be doubt—be outlawed. The Circuit Judge who speaks with special knowledge of Oklahoma law assures us that "the State of Oklahoma, by its Constitution and laws, makes it unlawful to possess, transport, furnish, or receive this particular shipment of intoxicating liquor, and it is therefore contraband and subject to seizure and confiscation under the laws of the State," 137 F. 2d at 279. Judge Murrah calls specific attention to an Oklahoma statute which makes it a misdemeanor "for any person in this State to receive directly or indirectly any liquors, the sale of which are prohibited by the laws of this State, from a common or other carrier."[1] The opinion of Judge Phillips recognizes that this Act of 1917 penalizes the

---

[1] "Section 1. It shall be unlawful for any person in this State to receive directly or indirectly any liquors, the sale of which is prohibited by the laws of this State, from a common or other carrier.

"It shall also be unlawful for any person in this State to possess any liquor, the sale of which is prohibited by the laws of this State, received directly or indirectly from a common or other carrier in this State. This section shall apply to such liquors intended for personal use, as well as otherwise, and to interstate as well as intrastate shipments or carriage. Any person violating any provision of this section shall be guilty of a misdemeanor, and upon conviction shall be fined not less than $50.00 nor more than $500.00 and by imprisonment for not less than thirty days nor more than six months; Provided, however, that scientific institutions, universities and colleges, and bonded apothecaries, druggists, hospitals or pharmacists may receive and possess pure grain alcohol, as provided by the laws of this State, to be used only for such purposes as are prescribed by the laws of this State." Laws 1917, ch. 186, p. 350, § 1.

transaction before us within Oklahoma, but rejects its bearing when a federal court is asked to grant an injunction involving this law by suggesting that this statute is "unconstitutional." He bases this suggestion on the argument that inasmuch as the Oklahoma Supreme Court has held that a statute making mere possession of over one quart of spirituous liquors unlawful is not "a reasonable exercise of the police powers," and therefore beyond the power of the legislature to make unlawful, *Ex parte Wilson*, 6 Okla. Cr. 451, 475, "it must likewise be beyond its power to make unlawful the possession of intoxicating liquor for personal use received from a common carrier." 137 F. 2d at 277.[2] In other words, it is argued that because the Oklahoma Supreme Court held that the mere possession of liquor cannot be made a crime by Oklahoma, Oklahoma cannot prohibit the receipt of liquor from a carrier. On such reasoning a law that has been on the Oklahoma statute books for more than twenty-five years, and during that period actively enforced and never questioned, is thrown into discard when a federal court is asked to exercise its duty of discretion in granting the extraordinary relief of an injunction. I am unable to follow such reasoning because Oklahoma law makes it baseless. The validity of this provision, as already indicated, has been taken for granted by the Oklahoma courts. It was the subject of litigation in *De Hasque* v. *Atchison, T. & S. F. Ry. Co.*, 68 Okla. 183, 173 P. 73, and *Crossland* v. *State*, 74 Okla. 58, 176 P. 944, and a conviction under this Section was sus-

---

[2] *Ex parte Wilson* was decided in 1911. In 1913, the Oklahoma legislature enacted a statute which made the possession of more than one quart of liquor "prima facie evidence of an intention to convey, sell or otherwise dispose of such liquors." Laws 1913, c. 26, p. 48, § 6, 37 O. S. A. § 82. The validity of this statute was upheld (*Caffee* v. *State*, 11 Okla. Cr. 485, 148 P. 680), and the Oklahoma court ruled that it superseded the 1911 Act which had been held invalid. Cf. *Jenkins* v. *State*, 28 Okla. Cr. 249, 230 P. 293; *Morse* v. *State*, 63 Okla. Cr. 445, 458, 77 P. 2d 757.

tained in *Walker* v. *State*, 18 Okla. Cr. 661, 197 P. 520.
This is a specific statute, the continuing validity of which
is wholly unaffected by speculative doubts regarding other
and irrelevant liquor legislation of Oklahoma. The dis-
senting judge was justified in reading the Act of 1917 as
conclusively condemning the transaction which the carrier
was seeking to consummate as an offense, were it subject to
Oklahoma law.[3]

But the shipment of liquor in controversy was for de-
livery on the Fort Sill Reservation, that is, a place within
the physical boundaries of Oklahoma but beyond its juris-
diction. It was stipulated between the parties that the
purpose of the suit was to enable the Transit Company to
transport and deliver the shipment to its destination in
the Reservation. Such was the basis of the District
Court's decree requiring the return of the shipment and
enjoining interference with "delivery of said shipment to
its destination" and no place else. This brings us to the
second half of the question in this case: may the Transit
Company, according to the law that rules such matters on
the Reservation, lawfully deliver this liquor at Fort Sill?
Of course all transactions on the Reservation are subject
to regulation by Congress. Constitution, Art. IV, § 3,

---

[3] At least one other provision of Oklahoma legislation may well be
found to outlaw the delivery of the shipment for the completion of
which the carrier is seeking the aid of the federal court. Chapter 16,
p. 16, § 1 of the Laws of 1939 makes it "unlawful for any person . . .
to import, bring, transport, or cause to be brought or transported into
the State of Oklahoma, any intoxicating liquor . . . without a permit
first secured therefor as hereinafter provided." 37 O. S. A. § 41. Per-
mits may be issued, under § 2 of that Act, only for the importation of
alcohol for scientific, mechanical, medicinal or sacramental purposes.
37 O. S. A. § 42. Since the importation of the liquor here involved
cannot possibly be said to fall within the classifications for which per-
mits are granted, these statutory provisions as applied to the circum-
stances in this case are penal, and as such, may be applicable to the
Reservation under the Assimilative Crimes Act. 54 Stat. 234, 18
U. S. C. § 468. See *infra*.

par. 2; see *Collins* v. *Yosemite Park Co.,* 304 U. S. 518; *Penn Dairies* v. *Milk Control Comm'n,* 318 U. S. 261; *Pacific Coast Dairy* v. *Department of Agriculture,* 318 U. S. 285. If it chooses, Congress may provide a rule of law which runs counter to the expressed dry policy of Oklahoma, and it may do so either specifically for Fort Sill or generally for all federal reservations. Congress has not done so. It has done the opposite. For more than a hundred years most of the rules of life on national reservations have been controlled by the laws of the States in which these reservations are located. By the Act of March 3, 1825 (4 Stat. 115), Congress provided that when something is done on a federal reservation which is not made penal by the laws of Congress but which under State law, if the State had jurisdiction, would be punishable, the act should be equally punished as wrongful if committed on the reservation. In thus adopting the penal laws of the States as its code for lawful conduct on federal reservations within the States, Congress did not give to the States a free hand to impose the continuing process of State law-making on places over which the United States has jurisdiction. Only the laws of the States existing at the time when the Act of March 3, 1825 was enacted became operative on the reservations. *United States* v. *Paul,* 6 Pet. 141. And so, in view of the inevitable modifications and additions in the penal laws of the States, · Congress has accommodated its adoption of those state laws, as the governing federal law, by bringing up to date from time to time its adoption for enforcement on federal reservations of the policies of the States which have penal sanctions. Accordingly, the Act of March 3, 1825, was in substance reenacted on April 5, 1866, 14 Stat. 12, 13, was carried forward in § 5391 of the Revised Statutes of 1878, was again reenacted on July 7, 1898, 30 Stat. 717, and became § 289 of the Federal Penal Code of 1910, 35 Stat. 1088, 1145. Since then and in relatively quick suc-

cession, Congress has three times brought still nearer the effective date of state penal laws applicable on federal reservations, to wit by the amendments of June 15, 1933, 48 Stat. 152; June 20, 1935, 49 Stat. 394; and June 6, 1940, 54 Stat. 234. The last Amendment now controls whereby

"Whoever . . . shall do . . . any act or thing which is not made penal by any laws of Congress, but which if committed or omitted within the jurisdiction of the State, Territory, or district in which such place is situated, by the laws thereof in force on February 1, 1940, and remaining in force at the time of the doing . . . of such act or thing, would be penal, shall be deemed guilty of a like offense and be subject to a like punishment." 18 U. S. C. § 468.

The very important purpose of this legislation in the working of our dual system, as expounded after the fullest consideration heretofore given to this subject by this Court, bears repetition:

"while the statute leaves no doubt where acts are done on reservations which are expressly prohibited and punished as crimes by a law of the United States, that law is dominant and controlling, yet, on the other hand, where no law of the United States has expressly provided for the punishment of offenses committed on reservations, all acts done on such reservations which are made criminal by the laws of the several States are left to be punished under the applicable state statutes. When these results of the statute are borne in mind it becomes manifest that Congress, in adopting it, sedulously considered the two-fold character of our constitutional government, and had in view the enlightened purpose, so far as the punishment of crime was concerned, to interfere as little as might be with the authority of the States on that subject over all territory situated within their exterior boundaries, and which hence would be subject to exclusive state jurisdic-

tion but for the existence of a United States reservation. In accomplishing these purposes it is apparent that the statute, instead of fixing by its own terms the punishment for crimes committed on such reservations which were not previously provided for by a law of the United States, adopted and wrote in the state law, with the single difference that the offense, although punished as an offense against the United States, was nevertheless punishable only in the way and to the extent that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the State." *United States* v. *Press Publishing Co.*, 219 U. S. 1, 9–10.[4]

Therefore the crucial question in relation to our present problem is whether any law of Congress has overridden the Oklahoma Act of 1917 which makes unlawful the transaction that the Transit Company seeks to consummate with the aid of an injunction issued by a federal court.

There is no such law. Long before the Twenty-first Amendment, Congress did provide that "The sale of or dealing in, beer, wine or any intoxicating liquors by any person in any post exchange or canteen or army transport or upon any premises used for military purposes by the United States, is hereby prohibited." Act of February 2,

---

[4] And see Webster, the sponsor of the bill in the Senate, in Register of Debates in Congress (Gales & Seaton, 1825) Vol. I, p. 338: "As to the third section [the precursor of the present Assimilative Crimes Act], it must be obvious, that, where the jurisdiction of a small place, containing only a few hundreds of people, (a navy yard for instance,) was ceded to the United States, some provision was required for the punishment of offences; and as, from the use to which the place was to be put, some crimes were likely to be more frequently committed than others, the committee had thought it sufficient to provide for these, and then to leave the residue to be punished by the laws of the state in which the yard, &c. might be. He was persuaded that the people would not view it as any hardship, that the great class of minor offences should continue to be punished in the same manner as they had been before the cession."

1901, § 38, 31 Stat. 748, 758, 10 U. S. C. § 1350. Plainly, the purpose of this legislation is not to supplant social policies in regard to alcoholic liquor in the various States within which the many federal enclaves are located except to the extent of providing minimum regulations to restrict the free dealing in liquor at all Army posts including those within wet States. The specific barrier thus erected by Congress against the liberal liquor policies of some States should not now be used as a qualification of the generality of the Assimilative Crimes Statute in order to serve as a barrier against the prohibitory laws of other States. No such policy can be drawn from the Act of 1901—quite the opposite is implied. And assuming that the military could assert such a policy in the interest of Army morale, there is wholly lacking any manifestation that the Army deems it necessary for the morale of its officers that at Fort Sill conduct should be permitted which if committed in the surrounding territory of Oklahoma would offend its penal laws. So far as the War Department has indicated a policy, its policy like that of the Assimilative Crimes Statute is to adopt on military reservations the laws of their respective States. Thus, in reference to A. G. 250.1, § VI, par. 4 (1–20–43) of Circular No. 29 of the War Department, Jan. 25, 1943, provides: "Beer of an alcoholic content not in excess of 3.2 per centum by weight may be sold or dealt in upon any of the mentioned premises unless a State enactment of the State in which the premises are located prohibits the sale of or dealing in such beer throughout the entire State." And the Judge Advocate General has said that "War Department policy does not favor sale of such [3.2] beer by exchanges in States where its sale is absolutely prohibited . . ." Bulletin of the Judge Advocate General of the Army, July 1942, p. 100, § 310.

Even if there were more hypothetical doubt than the laws and decisions of Oklahoma make manifest as to the

validity and vitality of the Act of 1917 and its applicability to the importation of the liquor shipment involved in this case, if the importation were into Oklahoma proper, such a contingency should be left for determination by appropriate proceedings in the state court to recover the liquor and not be made the basis for an injunction against the state law in the federal court. Since federal law here too turns on state law by adoption through the Assimilative Crimes Statute, the basis of our decision in *Penn Dairies* v. *Milk Control Comm'n, supra,* becomes relevant. Here, as in that case, there is an "absence of some evidence of an inflexible Congressional policy," 318 U. S. at 275, opposed to the policy expressed by the State. In this case as in that, we should therefore be slow to strike down state legislation by elaborate implications. The discretionary powers of equity particularly counsel against it. And even if there were more doubt than appears regarding the adoption of the Act of 1917 by the Assimilative Crimes Statute, whereby the delivery of the liquor by the Transit Company on the Reservation would constitute a misdemeanor, that doubt too should not be resolved against the law in such a proceeding as this for an injunction. That question although federal may also be litigated as part of the indicated state court suit, where the Attorney General may intervene and then come here if he chooses to assert whatever position the Government deems it appropriate to press.

In my view therefore it was an inequitable exercise of discretion to issue this injunction. Of course, "Equity does not demand that its suitors shall have led blameless lives." *Loughran* v. *Loughran,* 292 U. S. 216, 229. But where the relief sought is not as to something past and collateral, but where it is the very means, as is the case here, for completing an outlawed transaction, a court of equity should withhold its aid and not become the promoter of wrongdoing. The possible illegality of the seizure

of the liquor by the Oklahoma enforcement officers is quite irrelevant to our problem. "A question of public policy is presented—not a mere adjudication of adversary rights between the two parties." *Weil* v. *Neary*, 278 U. S. 160, 171. The abstention which equity exercises, as it should here, under the short-hand phrase of the "clean hands doctrine" is not due to any desire to punish a litigant for his uncleanliness. "But the objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself." Mr. Justice Brandeis in *Olmstead* v. *United States*, 277 U. S. 438, 485. It is hardly seemly for a federal court to order the return of liquor seized with full knowledge by the court that the carrier would use the liquor to share in the commission of a misdemeanor. The penal statute here applicable is a police regulation violation of which ought not to be furthered by a federal court. While its violation does not imply moral turpitude, Congress has required that army officers should also conform to the law of a State on which military reservations are located in matters that are outside military concern.