UNITED STATES of America, Appellee,

v.

Darelle Dean BUTLER, Appellant.

No. 76–1044.

United States Court of Appeals,
Eighth Circuit.

Submitted April 16, 1976.

Decided Sept. 2, 1976.

Rehearing En Banc Denied
Oct. 27, 1976.

Joseph Beeler, Miami, Fla., for appellant; Bruce Ellison, Wounded Knee Legal Defense/Offense Committee, Rapid City, S. D., filed appearance; Ray Archuleta, Serra, Perlson & Metcalf, San Francisco, Cal., on briefs.

R. D. Hurd, Asst. U. S. Atty., Sioux Falls, S. D., for appellee; William F. Clayton, U. S. Atty., and David R. Gienapp, Asst. U. S. Atty., Sioux Falls, S. D., filed appearance; Jonathan J. Anderson, Legal Intern, Sioux Falls, S. D., on briefs.

Before LAY and WEBSTER, Circuit Judges, and URBOM *, Chief District Judge.

LAY, Circuit Judge.

Darelle Dean Butler, an Indian, challenges his conviction for the possession of a firearm by a felon under state law, SDCL § 23–7–3, pursuant to the Assimilated Crimes Act, 18 U.S.C. § 13.

On September 5, 1975 Butler was observed by FBI agents on the Rosebud Sioux Reservation in South Dakota. He was known as an individual with prior felony convictions and was observed at the time to be wearing a .45 caliber revolver in a hip holster. On this basis he was arrested and charged with unlawful possession of the weapon.

Butler was originally indicted under a federal statute of general application, the National Firearms Act, 18 U.S.C. App. § 1202(a)(1)[1] and charged with receipt and possession of a firearm. A superseding indictment retained that charge as Count I and added a second count charging a violation of South Dakota law, SDCL § 23–7–3, under the Assimilated Crimes Act. The defendant moved to dismiss the first count for lack of jurisdiction and the second count for duplicity. The motions were denied, but the government voluntarily dismissed Count I before trial. The defendant then moved to dismiss Count II for lack of jurisdiction, but this motion was also denied. The defendant was tried and convicted for illegal possession of a weapon by a felon under South Dakota law as made applicable by the Assimilated Crimes Act.

On appeal Butler asserts a denial of equal protection and challenges the legality of the search, the sentencing process, and the jurisdiction of the federal district court to try him under the Assimilated Crimes Act (denoted ACA).

I. *Equal Protection.*

Butler argues that he has been denied equal protection of law, because the crime of possessing a firearm by a felon,

---

* The Honorable Warren K. Urbom, Chief Judge, United States District Court for the District of Nebraska, sitting by designation.

1. 18 U.S.C. App. § 1202(a) provides, in relevant part:
    (a) Any person who—
    (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,

and who receives, possesses or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000, or imprisoned for not more than two years, or both.

when committed on a federal enclave, carries a greater penalty than if committed elsewhere in the state. We disagree. In *United States v. Big Crow*, 523 F.2d 955 (8th Cir. 1975), we held the federal statutory scheme, which imposed a maximum penalty of five years for the commission of an assault by an Indian, but a maximum penalty of only six months when committed by a non-Indian, was in violation of equal protection of the laws under the Due Process Clause of the Fifth Amendment. Butler's situation is clearly distinguishable from that of *Big Crow*. First, Butler's two year sentence under the ACA was no greater than what he would have received under 18 U.S.C. App. § 1202(a) or 18 U.S.C. § 922(h). Secondly and more importantly, his prosecution under the ACA was not peculiar to his race. Any felon, whether White, Black or Indian, could be prosecuted under the ACA for possession of a firearm. Under these circumstances there can be no claim of invidious discrimination.

## II. *Search and Seizure.*

■ Butler also argues that the firearm was the fruit of an unlawful search and seizure. There can be no doubt in this case that the search was legal. The FBI agents were in the process of serving several arrest warrants when Butler, a known felon, entered the immediate vicinity wearing the firearm in a hip holster. Both requirements of the plain view doctrine were met: (1) the agents had a legal right to be in that position; and (2) the firearm was in plain view. *See, e. g., United States v. Webb*, 533 F.2d 391 (8th Cir. 1976); and *United States v. Williams*, 523 F.2d 64 (8th Cir. 1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976).

**2.** Interestingly enough, the defendant in the trial court originally moved to dismiss Count I on the ground that as an Indian he was not punishable under 18 U.S.C. § 1152, because § 1202(a)(1) was not an enclave law, and alternatively the Fort Laramie Treaty of 1868 gave exclusive jurisdiction of the crime to tribal law. After the government voluntarily dismissed Count I the defendant then urged, as it does on appeal, that he should have been prosecuted under § 1202(a)(1), rather than state law. Al-

## III. *The Sentencing Process.*

■ The sentence was alleged to be tainted, because the district court considered the fact that Butler had been recently indicted for murder. The record demonstrates that the district court had knowledge of Butler's recent indictment, but there was no showing that it affected the court's sentence. In fact the record is to the contrary.

## IV. *Federal Jurisdiction Under the Assimilated Crimes Act.*

The Assimilated Crimes Act reads:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of *any act or omission which, although not made punishable by any enactment of Congress*, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13 (emphasis added).

The defendant contends that the ACA was improperly applied in this case because his act *was* "made punishable by [an] enactment of Congress" within the meaning of the statute, so that resort to state law was not permissible.[2] The defendant argues under the reasoning of *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946) that 18 U.S.C. App. § 1202(a)(1) takes precedent over state law, and the latter cannot be allowed to expand the scope of the federal laws.[3]

though inconsistent in his pleas, a defendant cannot be prejudiced where the statutory mandate as to jurisdiction is clear. Both arguments are specious and on remand we consider it the law of the case that § 1202(a)(1) is applicable. *See* n. 5, *infra*.

**3.** As we discuss *infra*, 18 U.S.C. § 922(h) is also relevant. It reads:

(h) It shall be unlawful for any person—

The district court[4] rejected this argument, reasoning that the ACA's language, "any enactment of Congress," was intended to refer only to federal enclave laws. *See, e. g.,* 18 U.S.C. § 113. Construing § 1202(a)(1) as a general federal criminal statute, applicable to persons on or off federal enclaves,[5] and thus not specifically an enclave law, the district court found prosecution under the South Dakota statute proper.

■ We cannot accept such a narrow construction of the Assimilated Crimes Act.[6] This interpretation slights the plain meaning of the ACA and overlooks its legislative history and purpose.

*Plain Meaning.* The ACA makes state law applicable unless the "act or omission" is "made punishable by *any* enactment of Congress." Where a congressional enactment is not ambiguous there is no need for "indulging in uneasy statutory construction." *Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 501, 46 L.Ed.2d 450 (1976). *See, also, Huddleston v. United States,* 415 U.S. 814, 831, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974); *Yates v. United States,* 354 U.S. 298, 305, 77 S.Ct. 1064, 1 L.Ed.2d 1356

(1957); and *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95–6, 5 L.Ed. 37 (1820). It is difficult to reason here that Congress intended the words "any enactment" to mean only federal enclave laws. The history of the ACA is to the contrary.

*History.* The predecessors to 18 U.S.C. § 13 made no reference to specific congressional enactment such as federal enclave laws but, rather, referred to "any laws." The immediate predecessor to the ACA referred to "any act or thing which is not made penal by any laws of Congress." Act of June 5, 1940, Ch. 241, 54 Stat. 234. An earlier version used the phrase "not specifically provided for, by any law of the United States." Federal Crimes Act of March 3, 1825, Ch. 65, § 3, 4 Stat. 115.

■ *Purpose.* The district court based its interpretation of the ACA upon a supposed purpose to equalize the rights and duties of persons on and off federal enclaves. We find no history or precedent to support this interpretation. The legislative history of the ACA demonstrates that its purpose was not to equalize, but to fill the voids in the criminal law applicable to fed-

---

(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

.    .    .    .    .

to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

4. The Honorable Robert Merhige sitting by special assignment in South Dakota.

5. It is clear that most general federal criminal statutes do apply on federal enclaves, including the Rosebud Sioux Reservation. *See, United States v. McGrady,* 508 F.2d 13 (8th Cir. 1974), *cert. denied,* 420 U.S. 979, 95 S.Ct. 1408, 43 L.Ed.2d 661 (1975); *Stone v. United States,* 506 F.2d 561 (8th Cir. 1974), *cert. denied* 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Walks on Top v. United States,* 372 F.2d 422, 425 (9th Cir.), *cert. denied,* 389 U.S. 879, 88 S.Ct. 182, 19 L.Ed.2d 170 (1967). In addition, federal enclave statutes which define crimes only for the enclaves, including the Assimilated Crimes Act, are made applicable to Indian reservations by 18 U.S.C. § 1152, with certain exceptions not pertinent here. Section 1152 states:

Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152 and its exceptions apply only to enclave laws. They do not extend or restrict the application of *general* federal criminal statutes to Indian reservations.

6. In their briefs and on oral argument the government does not adopt the district court's construction. It simply argues that § 1202(a) is not applicable by reason of its requirement of greater proof relating to a nexus with interstate commerce.

eral enclaves created by the failure of Congress to pass specific criminal statutes. *See United States v. Sharpnack,* 355 U.S. 286, 288–89, 78 S.Ct. 291, 2 L.Ed. 282 (1958); *Williams v. United States,* 327 U.S. 711, 718–23, 66 S.Ct. 778, 90 L.Ed. 962 (1946); and *United States v. Press Publishing Co.,* 219 U.S. 1, 31 S.Ct. 212, 55 L.Ed. 65 (1911).[7]

Although the precise issue has not been discussed, other decisions have not applied state law under the ACA when a general federal statute punished the same conduct. *See, e. g., United States v. Olvera,* 488 F.2d 607 (5th Cir. 1973), *cert. denied,* 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974). (Possession of a controlled substance under 21 U.S.C. § 844(a).)

We conclude that the district court erred in its construction of the Assimilated Crimes Act and that the plain meaning of that Act requires state law not be "assimilated" where "*any* enactment of Congress" punished the conduct. We turn then to the question of whether *any* enactment of Congress covers the acts of the defendant

thereby precluding use of the ACA to apply state law.

▮ The government's original indictment under § 1202(a), charging the defendant with *both* receipt and possession, indicates that the government had probable cause that the defendant was punishable under an enactment of Congress specifically punishing his precise conduct. However, the district court reasoned that the conduct of the defendant was not "made punishable by [an] enactment of Congress," specifically not by § 1202(a)(1), because of the additional requirement[8] of the federal statute that the defendant possess the firearm "in commerce or affecting commerce."[9]

Whether a variance of proof changes the nature of the conduct was discussed in *Williams v. United States,* 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1946). There the defendant was convicted for statutory rape under state law pursuant to the ACA. The federal crime of carnal knowledge required proof that the victim was under 16 years of age and that force was used by the offend-

---

**7.** In *United States v. Press Publishing Co.,* the Court quoted Daniel Webster, who actually drafted the Federal Crimes Act of March 3, 1825, Ch. 65, § 3, 4 Stat. 115:

[I]t must be obvious that, where the jurisdiction of a small place . . . was ceded to the United States, some provision was required for the punishment of offenses; and as, from the use to which the place was to be put, some crimes were likely to be more frequently committed than others, the committee had thought it sufficient to provide for these, and then to leave the residue to be punished by the laws of the state in which the [enclave] might be.

219 U.S. at 12–13, 31 S.Ct. at 215.

**8.** The South Dakota statute, SDCL § 23–7–3, proscribes the possession of a firearm by a felon, but does not require proof of an interstate commerce nexus as does § 1202(a). The South Dakota statute provides:

No person who has been convicted in this state or elsewhere of a crime of violence shall own a pistol or have one in his possession or under his control. . . .

SDCL § 23–7–3.

The terms "pistol," "person," and "crime of violence" are defined by SDCL § 23–7–1.

**9.** In *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), the Supreme Court required proof of an interstate commerce

nexus as essential for a conviction under § 1202(a). The Supreme Court noted that when the charge was "possession," the government could meet its burden of proof by showing "at the time of the offense the gun was moving interstate or on an interstate facility, or if the possession affects commerce." 404 U.S. at 350, 92 S.Ct. at 524. A "receiving" charge under § 1202(a), however, as under § 922(h), (*see Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976) ) requires only a showing that the weapon had previously traveled in interstate commerce. For case law explanation as to the nexus required for "possession" as opposed to "receiving," *see, United States v. Hopkins,* 529 F.2d 775 (8th Cir. 1976); *United States v. Steeves,* 525 F.2d 33 (8th Cir. 1975); *United States v. Kelly,* 519 F.2d 251 (8th Cir. 1975); *United States v. Goings,* 517 F.2d 891 (8th Cir. 1975); *United States v. Haley,* 500 F.2d 302 (8th Cir. 1974); *United States v. Rollings,* 494 F.2d 344 (8th Cir. 1974); *United States v. Lupino,* 480 F.2d 720 (8th Cir. 1973); *United States v. Glasgow,* 478 F.2d 850 (8th Cir. 1973); and *United States v. Mancino,* 474 F.2d 1240 (8th Cir. 1973), *cert. denied,* 412 U.S. 953, 93 S.Ct. 3020, 37 L.Ed.2d 1007 (1973). *See, also, United States v. Bell,* 524 F.2d 202 (2d Cir. 1975); and *United States v. Cassity,* 509 F.2d 682 (9th Cir. 1974), *but contra, United States v. Snell,* 353 F.Supp. 280 (D.Md.1973).

er, and that the victim had not consented. Under Arizona law, a conviction was obtainable if the victim was under 18 regardless of consent or the lack of force. Williams, a married white man, had consensual intercourse with an Indian girl who was over 16 but under 18 years of age. Because he could not be convicted under the federal statute, the government prosecuted him under the ACA using Arizona law. Notwithstanding the variance of proof required between the state and the federal statute the Supreme Court set aside the conviction.

The analysis in *Williams* demonstrates that the Court was primarily concerned not with whether the *precise acts* had been made penal, but with the discernment of the intent of Congress to punish the *generic* conduct in question.[10] The Court observed:

> As to the particular offense involved in this case, the legislative history shows an increasing purpose by Congress to cover rape and all related offenses fully with penal legislation. . . . Congress repeatedly has increased its list of specific prohibitions of related offenses and has enlarged the areas within which those prohibitions are applicable. It has covered the field with uniform federal legislation affecting areas within the jurisdiction of Congress.

*Id.* at 724, 66 S.Ct. at 784.

More definitely the Court referred to the legislative history of the ACA:

> The word "offense" was changed so as to avoid the use of it as referring to an action which had not been prohibited and, therefore, technically could not be an "offense." *Possibly this change of the old phrase into the phrase "any act or thing which is not made penal by any laws of Congress" led to the present attempt to interpret it in a specific sense as refer-*

*ring to individual acts of the parties rather than in a generic sense referring to acts of a general type or kind.* The new words, in the light of the Congressional Committee's explanation of them, cannot, however, be regarded as changing the scope of the Act so substantially as to make it amend and enlarge the definition of an existing federal offense as well as to cover the case where an "offense" had not been prohibited. To do so would be contrary to the expressed purpose of the Committee to continue, rather than to change, its original meaning. In the instant case not only has the generic act been covered by the definition of having carnal knowledge, but the specific acts have been made "penal" by the definition of adultery.

*Id.* at 722–23, 66 S.Ct. at 784 (emphasis added).

Upon determining that Congress had intended to proscribe the generic conduct the Court held that state law could not be used to expand or restrict the scope of the federal law:

> The fact that the definition of this offense as enacted by Congress results in a narrower scope for the offense than that given to it by the State, does not mean that the congressional definition must give way to the State definition. . . . The interesting legislative history of the Assimilative Crimes Act discloses nothing to indicate that, after Congress has once defined a penal offense, it has authorized such definition to be enlarged by the application to it of a state's definition of it. It has not even been suggested that a conflicting state definition could give a narrower scope to the offense than that given to it by Congress. We believe that, similarly, a conflicting State definition does not enlarge the

---

**10.** In determining the applicability of the ACA reference is often made to the question as to whether "the precise acts have been made punishable by Congress." *See, United States v. Big Crow,* 523 F.2d 955, 958 .n. 4 (8th Cir. 1975); *United States v. Patmore,* 475 F.2d 752 (10th Cir. 1973); *Fields v. United States,* 438 F.2d 205 (2d Cir. 1971); *United States v. John-*

son, 426 F.2d 1112 (7th Cir. 1970); *Hockenberry v. United States,* 422 F.2d 171 (9th Cir. 1970); *United States v. Pardee,* 368 F.2d 368 (4th Cir. 1966); and *United States v. Jones,* 244 F.Supp. 181 (S.D.N.Y.), *aff'd,* 365 F.2d 675 (2d Cir. 1965). *Cf. United States v. Robinson,* 376 F.Supp. 1024 (D.Hawaii 1974) where the court referred to "equivalent" acts.

scope of the offense defined by Congress. The Assimilative Crimes Act has a natural place to fill through its supplementation of the Federal Criminal Code, without giving it the added effect of modifying or repealing existing provisions of the Federal Code.

*Id.* at 717–18, 66 S.Ct. at 781–82.

■ We turn then to the federal criminal statute in question. Despite strong suggestions in the legislative history that punishing possession of firearms by irresponsible persons was the main purpose of § 1202(a)(1)[11] we must adhere to the construction and purpose given the statute by the Supreme Court. *See, United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). In requiring proof of an interstate commerce nexus the Supreme Court found that the fundamental purpose of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, of which § 1202(a) is a part, was not to duplicate or supplant state law proscribing the possession of firearms by irresponsible persons. Thus, the government here argues that the intent of Congress in passing § 1202(a) was not directed at the mere possession of firearms, but at a totally different act: the possession of firearms moving in interstate commerce. On this basis the government contends, and the district court found, that the required interstate commerce nexus makes the federal crime of possession distinctive from the state crime.

Assuming, without deciding, that Congress in the passage of the "possession" provision of § 1202(a)(1) intended to regulate the interstate trafficking and not *mere* possession of firearms which would include possession by felons on enclaves, we, nonetheless, find that the "receipt" provisions of § 1202(a)(1) and § 922(h) constitute laws of the United States which were intended and do proscribe the *generic* conduct of acquisition and possession[12] of firearms by irresponsible persons, including felons on federal enclaves.[13] Under the receipt laws of § 922(h) and § 1202(a) the felon need not even know that the gun had traveled in interstate commerce. The interstate commerce element is satisfied by proof that *the gun* (not the felon in possession) has passed at some time in interstate commerce.

In *Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 45 L.Ed.2d 450 (1976), the Court held that the interstate commerce nexus requirement of § 922(h) could be met by proof that the firearm had *previously* traveled in interstate commerce. The Court cited the language of § 922(h), the structure of the Title IV of the Omnibus Act and the "manifest purpose of Congress" as supportive of their conclusion. In discussing the legislative history, the Court emphasized the purpose of Congress in

---

**11.** *See,* the appendix of *Stevens v. United States,* 440 F.2d 144, 152–66 (6th Cir. 1971) which contains the relevant portion of the legislative history of § 1202(a).

**12.** Unless one is a manufacturer, when one receives a firearm, he "acquires" it and therefore possesses it. In *United States v. Kelly,* 519 F.2d 251, 253 (8th Cir. 1975), we observed:

Although the legislative history is not detailed, it is readily apparent from it that the overall purpose of 18 U.S.C. App. § 1202(a) was to prevent certain classes of persons, among them convicted felons, from "acquiring" firearms. "Acquire," of course, does not imply a two-party transaction and neither, do we believe, does the term "receives" as used in the statute. Accordingly, we hold that a felon who acquires a weapon by theft, receives that weapon within the meaning of § 1202(a).

Webster's defines "acquire" simply as "to come into possession, control or power of disposal of often by some uncertain or unspecified means." *Webster's New International Dictionary* (3d ed. 1966).

**13.** If Butler was moving the gun in interstate commerce, as originally charged in Count I of the superseding indictment (seemingly a tacit admission by the government that his precise conduct was punishable by an enactment of Congress), then the assimilation of state law under the ACA would not be proper. However, the fact that such factual proof is not in the record should have little relevance. Otherwise, the government could avoid the Congressional requirement, that prosecution proceed under the applicable federal criminal statute, by simply electing to proceed under the ACA and the lesser burden of proof required by state law. This, of course, is contrary to the reasoning of *Williams.*

passing Title IV as opposed to Title VII, was not directed to interstate trafficking in firearms but, rather, to the acquisition and possession of firearms by certain classes of people. *Id.* 96 S.Ct. at 502–03.

The added requirements of proof of an interstate nexus and of venue [14] under a federal receipt charge do not serve to make the state law applicable and the federal law inapplicable under the ACA. If they did the test of applicability of the ACA would be whether the exact same elements of proof are required under the state and federal laws. *Williams* holds directly to the contrary. The test is not whether the same elements of proof are contained in both state and federal statutes, but whether the acts of the defendant are made punishable under *any* enactment of Congress. As *Williams* makes clear, "acts" under the ACA does not refer to "individual acts of the parties" but, rather, in a "generic sense" to acts of a general type or kind which are prohibited. In addition, Congress in enacting the ACA did not intend that the assimilation of state law was to depend on a prosecutor's selection of a statute under which it would be easier to obtain a conviction.

In summary, we hold that the generic conduct of acquisition and receipt of firearms by felons is punishable under § 1202(a)(1) and § 922(h), and the fact that the federal statutes are narrower in scope does not allow the federal government to use state law to broaden the definition of a federal crime.

Under the circumstances, we find that the district court erred in failing to dismiss

14. Under a receiving charge, as opposed to a charge of possession, the government assumes the additional charge of proving venue, that is the receipt of the firearm occurred in the district where the prosecution takes place. *United States v. Kelly,* 519 F.2d 251, 254 (8th Cir. 1975); and *United States v. Haley,* 500 F.2d 302, 304–05 (8th Cir. 1974).

15. In a number of cases where the defendant has been erroneously convicted under the ACA, the appellate courts have allowed the conviction to stand, but have remanded for resentencing under the appropriate federal statute. *See,*

Count II, which charged Butler pursuant to the ACA with violating the South Dakota statute. We vacate the judgment of conviction for lack of jurisdiction.[15]

*e. g., United States v. Word,* 519 F.2d 612 (8th Cir. 1975), *cert. denied,* 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975); *United States v. Olvera,* 488 F.2d 607 (5th Cir. 1973), *cert. denied,* 416 U.S. 917, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974); and *Hockenberry v. United States,* 422 F.2d 171 (9th Cir. 1970).

Here, however, the government has not attempted to prove an interstate commerce nexus and if the defendant is to be tried under § 1202(a)(1) or § 922(h) proof of an interstate commerce nexus is required.