**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Walter T. BEST, Defendant-Appellant.**

**No. 77–2836.**

United States Court of Appeals,
Ninth Circuit.

March 31, 1978.

Robert M. Holley, Sacramento, Cal., for defendant-appellant.

Harry Hull, Asst. U.S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before ELY, WRIGHT and CHOY, Circuit Judges.

CHOY, Circuit Judge:

While this appeal arises from a simple conviction for drunk driving, it raises important issues involving the interpretation of the Assimilative Crimes Act, the formulation of federal common law, and the limits upon federal authority over the states imposed by the Constitution.

Appellant Best pleaded guilty to driving a vehicle on McClellan Air Force Base (a federal enclave in the State of California) while under the influence of alcohol, in violation of California Vehicle Code § 23102(a), a statute incorporated into federal law by 18 U.S.C. § 13, the Assimilative Crimes Act. The United States Magistrate for the Eastern District of California sentenced Best to serve ten days in jail and to pay a fine of $350 pursuant to Cal.Veh. Code § 23102(c).[1] The magistrate further ordered that appellant's driver's license be suspended for six months pursuant to Cal. Veh.Code § 13201.5(a).[2] Best moved to correct the sentence under Fed.R.Crim.P. 35 on the ground that the magistrate lacked the power to suspend his driver's license. The motion was denied, and the district court affirmed that denial. We reverse and remand.[3]

---

1. In pertinent part, § 23102 provides:
   (a) It is unlawful for any person who is under the influence of intoxicating liquor, or under the combined influence of intoxicating liquor and any drug, to drive a vehicle upon any highway.
   *   *   *   *   *   *
   (c) Any person convicted under this section shall be punished upon a first conviction by imprisonment in the county jail for not less than 48 hours nor more than six months or by fine of not less than two hundred fifty dollars ($250) nor more than five hundred dollars ($500) or by both such fine and imprisonment. . . .

2. Section 13201.5 provides that "[a] court may suspend the privilege of any person to operate a motor vehicle, for a period not exceeding six months, upon conviction of driving while under the influence of intoxicating liquor or under the combined influence of intoxicating liquor and any drug. . . ."

3. By its terms, the magistrate's six-month order of suspension expired on October 29, 1977. However, since appellant is challenging the validity of the suspension itself, an unresolved dispute continues to exist. This, together with the fact that appellant remains subject to the challenged authority of the magistrate to suspend his driver's license whenever he drives on McClellan Air Force Base renders the case not moot. *Carroll v. Princess Anne,* 393 U.S. 175, 179, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968).

Furthermore, a six-month suspension of driving privileges presents a situation "capable of repetition, yet evading review" falling under the rule of *Southern Pacific Terminal Co. v.*

*ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). *See Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Carroll v. Princess Anne,* 393 U.S. at 178–79, 89 S.Ct. 347. A declaration of mootness because a suspension order has expired would prevent this issue from ever being litigated by this appellant and by any other person whose driver's license is similarly suspended. Such a determination would allow the district courts to determine the rights of those convicted of drunk driving without opportunity for redress.

Finally, the imposition of a criminal sentence has collateral consequences apart from the fact of conviction itself which justify a decision on the validity of the sentence after its expiration. *Pollard v. United States,* 352 U.S. 354, 358, 77 S.Ct. 481, 1 L.Ed.2d 393 (1956). As the Court noted in *Sibron v. New York,* 392 U.S. 40, 55, 83 S.Ct. 1889, 20 L.Ed.2d 917 (1968), *Pollard* rejected inquiry into the existence of specific collateral consequences in favor of a presumption that such consequences exist. In the instant case, failure of this Court to review would leave appellant with a criminal sentence of suspension imposed under color of the Assimilative Crimes Act.

Accordingly, we feel that the issue of the validity of the magistrate's order is appropriate for decision in this case. This conclusion is buttressed by the facts that the mootness argument was not raised by either of the parties and was first presented in supplemental briefs by order of this Court, both parties agreeing that Best's case is not moot, and the underlying issue was argued below and fully briefed before

Appellant does not dispute the sentence of ten days or the fine. However, he contends that the portions of the California Vehicle Code providing for suspension of driver's licenses are not incorporated into federal law by virtue of the Assimilative Crimes Act, and that the suspension of his California driver's license by a federal magistrate is an impermissible interference with that state's regulation of its highways.

### Assimilative Crimes Act

■ The Assimilative Crimes Act, 18 U.S.C. § 13, states:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title [defining the special maritime and territorial jurisdiction of the United States], is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

The purpose of this statute, the history of which dates to 1825,[4] is to conform the criminal law of federal enclaves to that of local law except in cases of specific federal crimes. *United States v. Sharpnack,* 355 U.S. 286, 289–95, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958); *Acunia v. United States,* 404 F.2d 140, 142 (9th Cir. 1968). It has been described as "a shorthand method of providing a set of criminal laws on federal reservations by using local law to fill the gaps in federal criminal law," *United States v. Prejean,* 494 F.2d 495, 496 (5th Cir. 1974), and does not apply where another federal statute makes criminal the same conduct condemned under state law.[5] The Act is appropriately applied here, since there is no

express enactment of Congress providing punishment for drunk driving. *See United States v. Walker,* 552 F.2d 566, 568 (4th Cir. 1977).

■ However, the Act by its own terms incorporates into federal law only the *criminal* laws of the jurisdiction within which the enclave exists; it is, itself, a penal statute. *See United States v. Sharpnack, supra,* 355 U.S. at 291–93, 78 S.Ct. 291. Thus, in the instant case only those California statutes making drunk driving a criminal offense and authorizing punishment therefor are assimilated into federal law under the Act.

■ Appellant contends that the provisions of the California Vehicle Code providing for suspension of driver's licenses are regulatory and not punitive. He would, for purposes of determining whether the statutes in question are within the scope of the Act, rely on state definitions of "punishment." California's interpretation of those of its criminal statutes incorporated into federal law is of course binding under the Act. But California's definition of "punishment" cannot govern if it conflicts with the scope of that term as used in the federal statute. What meaning Congress intended is a federal question which we must determine. *See Johnson v. Yellow Cab Co.,* 321 U.S. 383, 391, 64 S.Ct. 622, 88 L.Ed. 814 (1944); *Puerto Rico v. Shell Co.,* 302 U.S. 253, 265–66, 58 S.Ct. 167, 82 L.Ed. 235 (1937); *see also Reconstruction Finance Corp. v. Beaver County,* 328 U.S. 204, 208, 66 S.Ct. 992, 90 L.Ed. 1172 (1946).

In *United States v. Sharpnack, supra,* the Supreme Court analyzed the history of the Assimilative Crimes Act beginning with the Act of 1825, sponsored by Daniel Webster in the House of Representatives, in which the Congress expressly adopted the fundamental policy of "conformity to local law." The Court concluded that the succeeding series of reenactments culminating in the present

---

this Court. *See United States v. Hole,* 564 F.2d 298, 300 n.2 (9th Cir. 1977).

4. Act of March 3, 1825, c. 65, § 3, 4 Stat. 115; *see United States v. Sharpnack,* 355 U.S. 286, 289, 78 S.Ct. 291, 2 L.Ed.2d 282 (1955).

5. *See United States v. Marcyes,* 557 F.2d 1361, 1365 (9th Cir. 1977); *United States v. Peterson,* 550 F.2d 379, 383 (7th Cir. 1977); *United States v. Butler,* 541 F.2d 730 (8th Cir. 1976).

statute "demonstrates a consistent congressional purpose to apply the principle of conformity to state criminal laws . . . ." 355 U.S. at 290–91, 78 S.Ct. at 295. The rationale for this policy was articulated in the earlier case of *United States v. Press Publishing Co.*:

> It is certain . . . that as to such offenses the *state law, when they are by that law defined and punished,* is adopted and made applicable. . . . When these results of the statute are borne in mind, it becomes manifest that Congress, in adopting it, sedulously considered the twofold character of our constitutional government, and had in view the enlightened purpose, so far as the punishment of crime was concerned, to interfere as little as might be with the authority of the states on that subject . . . .

219 U.S. 1, 9, 31 S.Ct. 212, 214, 55 L.Ed. 65 (1911) (emphasis supplied). Pursuant to this rationale, we recently determined that particular state laws were prohibitory rather than regulatory against the backdrop of the Act's policy that a state's penal laws will be uniformly applied to citizens on and off federal enclaves. *United States v. Marcyes,* 557 F.2d 1361, 1364–65 (9th Cir. 1977).

■ We think the congressional purpose can best be achieved by application of state interpretations of what constitutes "punishment," since this accomplishes the Act's objective of providing a criminal law for federal enclaves while at the same time effectuating the policy of conformity to local law.[6]

### California Law

■ The California scheme for suspending the driver's licenses of those who are convicted of drunk driving is dichotomous: authority to suspend is vested both in the courts and in the Department of Motor Vehicles (DMV) under certain circumstances. Thus, pursuant to Cal.Veh.Code § 13352, the DMV is required to suspend the license of one who is convicted for the second time of drunk driving whether or not the court orders suspension. While no California authority appears with respect to court-ordered suspensions, it is well established that such departmental suspensions are regulatory and not penal. *See, e. g., Beamon v. Department of Motor Vehicles,* 180 Cal.App.2d 200, 209–10, 4 Cal.Rptr. 396, 403 (1960).

Until recently, the dichotomy between court-ordered and departmental suspensions was more clear. When *Beamon* was written, for example, California gave the DMV and the courts concurrent authority to suspend driver's licenses after the first conviction for drunk driving, so that where a court chose not to suspend the convict's license, the DMV could still do so in its discretion even in the face of the court's recommendation of no suspension. *See* former Cal.Veh.Code §§ 13352, 13354; *Hough v. McCarthy,* 54 Cal.2d 273, 281–82, 5 Cal. Rptr. 668, 673–74, 353 P.2d 276, 280 (1960). However, this clear definition no longer exists with respect to first convictions for drunk driving.

Cal.Veh.Code § 13201.5, enacted in 1975, provides that the court *may* suspend a driver's license upon a first conviction, while § 13352(a), enacted in 1972, *requires* the DMV to suspend a driver's license upon a first conviction *except* "where the court does not order the department to suspend."[7] Moreover, the DMV's discretionary suspension authority, which formerly included first convictions for drunk driving, *see Hough v. McCarthy, supra,* no longer extends to this ground. *See* Cal.Veh.Code §§ 13361, 16430; *see also* Cal.Veh.Code §§ 13359, 12805–09, 13800. Finally, Veh. Code § 13210, enacted in 1971, makes it mandatory for the court to *order the department* to suspend upon a first conviction "unless the person shows good cause why such order should not be made."

---

**6.** *See* Note, *The Federal Assimilative Crimes Act,* 70 Harv.L.Rev. 685, 696 (1957).

**7.** Cal.Veh.Code § 1803 requires the clerk of court to forward an abstract of any conviction for violation of the Vehicle Code to the DMV, which, pursuant to § 13352, must suspend for a first conviction of drunk driving except where the court does not order suspension.

Thus, suspension upon a first conviction for drunk driving pursuant to Cal.Veh.Code § 13201.5 is not susceptible to classification as strictly court-ordered or strictly departmental. Rather, it is a hybrid procedure wherein the court effectively orders the DMV to suspend.[8] The California cases dealing with departmental suspension are therefore not precisely apposite. The rationale of those cases, however, is sufficiently articulated so that we may conclude that under the existing statutory scheme, suspension upon a first conviction of drunk driving does not constitute "punishment" under California law.

In *Beamon v. Department of Motor Vehicles, supra,* 180 Cal.App.2d 200, 210, 4 Cal. Rptr. 396, 403 (1960), the California Court of Appeal upheld the grant of suspension authority to the DMV against a challenge that it comprised an unconstitutional delegation of judicial and legislative power, based on the following reasoning:

> The suspension of or revocation of a license is not penal; its purpose is to make the streets and highways safe by protecting the public from incompetence, lack of care, and wilful disregard of the rights of others by drivers. [Citations omitted] The fact that petitioner may suffer inconvenience and even economic loss because he has been denied a license does not make the remedial action of the department the imposition of punishment for past offenses.

Similarly, in *Henry v. Department of Motor Vehicles,* 25 Cal.App.3d 649, 102 Cal. Rptr. 36 (1972), the court concluded from the divergence of circumstances that could give rise to suspension, including the fact that the DMV was given discretionary suspension authority, that the legislature did not intend that suspensions have any "proportioned relation to penal sanctions." 25 Cal.App.3d at 654–55, 102 Cal.Rptr. at 40. The court stated:

> [A] suspension or revocation . . . is not a penal sanction. [Citations omitted] It follows that the propriety of a suspension or revocation is not calibrated with reference to the character of the criminal penalty that might be imposed.

25 Cal.App.3d at 654, 102 Cal.Rptr. at 40.

Furthermore, the state court has recently upheld a subsection of Cal.Veh.Code § 13201.5 under which state courts are authorized to direct consenting persons in four counties to undergo an experimental rehabilitation program in lieu of suspension of their driver's licenses upon a first conviction, based on the rationale of *Hough v. McCarthy, supra.* The court held that § 13201.5 is "principally concerned with the administration and control of those who are licensed by the Department of Motor Vehicles to use the highways." *McGlothlen v. Department of Motor Vehicles,* 71 Cal. App.3d 1005, 1019, 140 Cal.Rptr. 168, 177 (1977).

Since suspension of driver's licenses is not "punishment" under California law, the provisions of Cal.Veh.Code §§ 13201.5 and 13352 providing for suspension upon a first conviction of drunk driving are not incorporated into federal law under the terms of the Assimilative Crimes Act, and the magistrate's order of suspension cannot be supported on this ground.

### Federal Common Law

In reviewing the decision of a lower court, we must affirm if the result is correct, although the lower court relied upon a wrong ground or gave a wrong reason, *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224 (1937), since "[i]t would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appel-

---

**8.** Characterization of the nature of the suspension is further clouded by Cal.Veh.Code §§ 13206 and 13550, which provide that where *departmental* suspension is mandatory (including first convictions for drunk driving where the court orders suspension), the convict must surrender his license to the *court,* which then forwards it to the department. In addition, Cal.Veh.Code § 13210 describes a procedure whereby the court, if it does not order suspension, may "limit the person's driving privilege" without any DMV involvement.

**1101**

late court to formulate." *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *see United States v. Stevens*, 548 F.2d 1360, 1363 n.9 (9th Cir.), cert. denied, 430 U.S. 975, 97 S.Ct. 1666, 52 L.Ed.2d 369 (1977). Since we have determined that no specific federal statute governs here, and that the suspension authority of the California Vehicle Code is not incorporated into federal law under the Assimilative Crimes Act, the magistrate's order must be authorized, if at all, as a matter of federal common law.

■ It must first be noted in this respect that there is no federal common law of crimes. In *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812), the Supreme Court held that there was no jurisdiction in the federal courts to try criminal charges based on the common law and that all federal crimes must be based on statutes of Congress. *See also United States v. Coolidge*, 14 U.S. (1 Wheat.) 415, 4 L.Ed. 124 (1816). This rule is now well settled. *See, e. g., Keeble v. United States*, 412 U.S. 205, 215, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) (Stewart, J., dissenting); *Krulewitch v. United States*, 336 U.S. 440, 456–57, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 468–69, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Jackson, J., concurring); *Todd v. United States*, 158 U.S. 278, 282, 15 S.Ct. 889, 39 L.Ed. 982 (1895). Just as the federal judiciary may not create crimes outright or enlarge the reach of enacted crimes, *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952), neither may it impose punishments not provided for by the federal statute applicable to the described conduct.

However, here we are dealing with a court-ordered remedy that does not constitute punishment; and it is equally well settled that wherever the federal courts have occasion to decide a federal question which cannot be answered from federal statutes alone, they may resort to all of the source materials of the common law. Were the federal courts bereft of the common law in such instances, "our federal system would be impotent. This follows from the recognized futility of attempting all-complete statutory codes, and is apparent from the terms of the Constitution itself." *D'Oench, Duhme & Co. v. FDIC, supra*, 315 U.S. at 469–70, 62 S.Ct. at 685 (Jackson, J., concurring).

■ The question posed here is whether the federal government, in the absence of a specific federal statute or applicable California criminal sanction, is entitled to a nonstatutory equitable remedy against drunk driving on a federal enclave. We conclude that it is, both to protect the property of the United States [9] and to facilitate the discharge of its constitutional duties enumerated in Art. I, § 8, pursuant to which McClellan Air Force Base is maintained.[10] This is so despite the fact that appellant was charged only with a criminal violation. In *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 201–04, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967) and *United States v. Republic Steel Corp.*, 362 U.S. 482, 491–92, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960), involving the obstruction of navigable waterways forbidden by federal statute, it was held that the statutory remedies, which included criminal penalties, were not exclusive. The Court in *Wyandotte* permitted the government to recover its expenses incurred in removing a negligently sunken barge, and in *Republic Steel* it authorized an injunctive order to restore the depth of a river decreased by deposits of industrial

9. *See Cotton v. United States*, 52 U.S. (11 How.) 229, 13 L.Ed. 675 (1850) (permitting an action of trespass without statutory authorization); *United States v. Gear*, 44 U.S. (3 How.) 120, 11 L.Ed. 523 (1845) (upholding injunction to restrain waste on public land).

10. *See Sanitary District v. United States*, 266 U.S. 405, 425–26, 45 S.Ct. 176, 69 L.Ed. 352 (1925) (upholding injunction based on authority of United States to remove obstructions to interstate and foreign commerce); *In re Debs*, 158 U.S. 564, 583–84, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) (upholding injunction based on postal, interstate commerce, and general welfare powers).

solids. *See also Hines, Inc. v. United States,* 551 F.2d 717 (6th Cir. 1977).[11]

▆▆▆▆ In fashioning a common law remedy to protect the federal interest, the federal courts may look to state law. *See, e.g., Textile Workers v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Royal Indemnity Co. v. United States,* 313 U.S. 289, 296–97, 66 S.Ct. 995, 85 L.Ed. 1361 (1941); *Board of Commissioners v. United States,* 308 U.S. 343, 350–52, 60 S.Ct. 285, 84 L.Ed. 13 (1939). Indeed, such a choice of law may be especially appropriate here in view of congressional intent to conform the law of federal enclaves to local law. However, the magistrate's suspension of Best's California driver's license pursuant to Cal.Veh.Code § 13201.5(a) exceeds the scope of the federal interest, and is unduly intrusive on that state's regulation of its highways.

### Intrusion on State Regulation

An order of suspension pursuant to Cal. Veh.Code § 13201.5, as noted earlier, in effect requires the DMV to suspend the license. Thus, if we were to uphold the magistrate's order, we would be authorizing a federal court to require a California agency to carry out the federal order to suspend a state-created privilege to drive on California's highways.

▆▆▆▆ The federal interest does not warrant such interference with this state-created privilege. In fashioning nonstatutory equitable relief, the magistrate's court might properly limit the driving privileges of convicted drunk drivers on McClellan Air Force Base or other federal enclaves. In addition, it might forward to the DMV notice of drunk driving convictions in that court pursuant to Cal.Veh.Code § 13363, which authorizes the DMV to suspend "upon receiving notice of the conviction of the person in a state, territory, or possession of the United States . . . of an offense therein which, if committed in this State, would be grounds for the suspension . . . of the privilege to operate a motor vehicle." But where not required for protection of the federal interest, it may neither suspend a state driver's license nor order the state to do so, any more than it could dissolve a state-chartered corporation in federal *quo warranto* proceedings or sentence criminals convicted in federal court to terms in the state prison.[12]

This limitation on the permissible scope of a federal common law remedy in this case is compelled not only by the congressional policy with respect to federal enclaves "to interfere as little as might be with the authority of the states," *United States v. Press Publishing Co., supra,* 219 U.S. at 9, 31 S.Ct. at 214, but also by the tenth amendment and federalism restraints implicit in the Constitution as a whole, which place the integral government functions of states and localities beyond the scope of federal authority. *National League of Cities v. Usery,* 426 U.S. 833, 842–45, 851, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). This Circuit has recently held that the limitation upon the power of Congress recognized in *National League of Cities* applies equally to the power of the federal courts. *Davids v. Akers,* 549 F.2d 120, 127 (9th Cir. 1977). And while it is true that in some respects, such as air pollution, the

11. There is no doubt, given *Wyandotte* and *Republic Steel,* that the federal government could obtain an equitable remedy in a separate civil proceeding based on the policy of the federal criminal statute. Where, as here, the issues in the criminal and civil cases are identical—especially given the higher standard of proof in a criminal trial—judicial economy militates toward the imposition of both civil and criminal sanctions in the same proceeding. Indeed, the California courts, having defined the sanction of suspension as nonpenal, routinely impose the statutory civil remedy in criminal proceedings.

12. Sentencing under the Assimilative Crimes Act presents similar problems. While the Act serves to incorporate state offenses and penalties into the criminal law for federal enclaves, it does not authorize the federal courts to impose punishment *exactly* as specified in state statutes, but only "like punishment." Thus, were the suspension of one's driver's license held to constitute "punishment" under the Act, the conclusion with respect to the scope of the magistrate's order would be the same.

regulation of traffic takes on a "strong regional and interstate character" permitting the cooperation of city, state, and federal authorities, *see Friends of the Earth v. Carey*, 552 F.2d 25, 38 (2d Cir. 1977), there is little question that the licensing of drivers constitutes "an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens." *National League of Cities, supra*, 426 U.S. at 855, 96 S.Ct. at 2476.

Accordingly, the order suspending appellant's driver's license is reversed, and the cause remanded to the federal magistrate for formulation of an order consistent with this opinion.

REVERSED and REMANDED.

ELY, Circuit Judge, concurring and dissenting:

I concur in the majority's construction of the Assimilative Crimes Act; however, could I act alone, I would hold that the appeal is moot. This, I would do despite the position that the parties take on the issue of mootness. *See DeFunis v. Odegaard*, 416 U.S. 312, 315, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). It is quite understandable that they desire a definitive holding and have thus agreed that the appeal is not moot. My disagreement with them, as well as with my Brothers, is founded upon my interpretation of the controlling authorities. *See Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (in absence of a class action, to avoid mootness under the "capable of repetition, yet evading review" doctrine, the particular litigant must demonstrate a reasonable possibility of repetition as to him personally; possibility of repetition as to others is irrelevant); *Board of School Comm'rs v. Jacobs*, 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Gerstein v. Pugh*, 420 U.S. 103, 110–11 n.11, 95 S.Ct. 854 (1975); *Sosna v. Iowa*, 419 U.S. 393, 399, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *DeFunis v. Odegaard, supra*, 416 U.S. at 319, 94 S.Ct. 1704; *North Carolina v. Rice*, 404 U.S. 244, 247–48, 92 S.Ct. 402, 30 L.Ed. 413 (1971) (holding moot a

challenge to the legality of a sentence already served, refusing to invoke collateral consequences doctrine, which applies only to attacks upon a conviction itself).